[Cite as *State v. Carter*, 2017-Ohio-7501.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 15 MA 0225 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| KALONTAE CARTER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 14 CR 960

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant: Atty. Anthony J. Farris
860 Boardman-Canfield Rd. Ste. 204
Youngstown, Ohio 44512

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: August 30, 2017

ROBB, P.J.

{¶1} Defendant-Appellant Kalontae Carter appeals from his conviction of aggravated murder after a jury trial in the Mahoning County Common Pleas Court. Appellant argues his co-defendant's statement to another inmate should not have been admitted. Appellant asks us to review the removal of three African-American prospective jurors and a statement by the prosecutor in the rebuttal portion of closing argument. Appellant raises various claims of ineffective assistance of counsel. He also states there was not sufficient evidence for the purpose element of aggravated murder and asks for a manifest weight of the evidence review focusing on whether he knew a robbery was going to be committed. Appellant argues the mandatory transfer of juveniles to the general division is unconstitutional and asks this court to apply the Ohio Supreme Court's decision in *Aalim*. As *Aalim* was vacated on reconsideration, this argument fails. For the following reasons, the trial court's judgment is upheld.

STATEMENT OF THE CASE

{¶2} On April 29, 2013, Kristopher Stuart was shot to death in his house on Elm Street in Youngstown. Upon arriving at the scene, police learned Appellant and his uncle, DeJuan Thomas, arrived at separate hospitals with gunshot wounds. On November 14, 2013, a murder complaint was filed against Appellant in juvenile court. As Appellant was 17 at the time of the act charged and the juvenile court found probable cause to believe he committed murder, Appellant was subject to mandatory transfer to the general division of the common pleas court. *See* R.C. 2151.12 (A)(1)(a)(i).

{¶3} After bindover, Appellant was indicted for aggravated murder and aggravated robbery; he was alternatively indicted for murder and felonious assault. Each of the four counts was accompanied by a firearm specification. DeJuan Thomas was indicted as a co-defendant on these counts (and on a separate count of having a weapon while under disability). In the same indictment, Laquawn Hopkins, the victim's roommate, was charged with tampering with evidence.

{¶4} Appellant's case was tried to a jury. The victim's brother testified the victim sold drugs, including marijuana and heroin. (Tr. 409, 411, 417). He was 26 years old when he died. The victim previously lived with Lorraine McKinnon, who

was like a "mother figure" to the victim, but the brother blamed her for the victim's involvement in drug trafficking. (Tr. 413-414, 418). The victim's neighbor confirmed the victim was a drug dealer. (Tr. 421-422).

{¶5} On the evening of April 29, 2013, this neighbor heard arguing at the victim's house and then heard a barrage of gunshots. (Tr. 424-426). She soon heard running on the walkway between their houses, but she remained on the floor for a time. When she eventually looked out her window, she saw Appellant's roommate "Q" approach his car, go back to the house, return to his car, and drive away. (Tr. 422, 427). She called 911 to report gunfire. A police car drove past but did not stop. (Tr. 428). The neighbor noticed the victim's door was open. (Tr. 428). At this point, Q returned to look for his phone which he found near the driveway. (Tr. 429, 439). The neighbor spoke to other neighbors about the situation, and they called 911 to report the gunfire and the open door. She then approached the open door with them and saw the victim's body in the house, at which point they called 911 again. (Tr. 430-431).

{¶6} An officer testified he responded to a call of gunfire on Elm Street around 9:30 p.m. He drove around the area but did not notice anything unusual. (Tr. 459). He was soon dispatched to the hospital as DeJuan Thomas had arrived in critical condition after being shot. (Tr. 460). Bullet fragments were recovered during surgery and a bag of pills was found on his person. (Tr. 484, 540). While the officer was at the hospital, Appellant was transferred there from another hospital. (Tr. 461, 492). Appellant had a gunshot wound to the left bicep area. From his experience, the officer ascertained this was a "contact shot" or a close range gunshot wound describing it as: "massive. It was opened up almost like an explosion. It was much larger than a bullet hole. It was, you know, you can put your hand in it. And there were burn marks, you know, around the edges." (Tr. 461-462, 476-477). Appellant told the officer he was walking on Norwood Street near his home when shots were fired at him from a passing vehicle. (Tr. 462-462). He soon repeated this story to a detective as well. (Tr. 492). The area near Appellant's residence was investigated; no blood or casing was found, and residents did not hear gunfire. (Tr. 494).

{¶7} When police responded to the more specific 911 call around 10:30 p.m., they found the deceased victim on the floor in his Elm Street residence with a silver Smith & Wesson .357 Magnum revolver at his fingertips. (Tr. 445, 447, 536-537, 660). The victim suffered eleven bullet wounds, with the following entry points: three in the chest, two in the back, one in the abdomen, one in the hip, two in the left thigh, one in the right hand, and one grazing the left hand. (Tr. 673-678). The coroner found the victim's wallet containing $445 on his person. (Tr. 710). The victim had opiates in his system. (Tr. 712). The police found a scale, pills, and baggies containing suspected heroin and cocaine at the scene. (Tr. 513, 743).

{¶8} The cylinder of the six-shot revolver contained one live round and five spent cartridges, all of them .357 Magnum caliber. (Tr. 536, 538, 652, 660-661). The victim's DNA was found on the trigger, and a mixture of the victim's DNA and DNA consistent with Appellant was found on the handle of the revolver. (Tr. 638). This was believed to be Appellant's touch DNA, but due to the amount of blood at the scene, it was possible the DNA on the revolver's handle was from blood. (Tr. 645-646). In the 12-foot by 12-foot room where the victim was lying, there was blood on a mattress; in this vicinity, there was blood spatter on the window blinds and blood and body matter on the ceiling. (Tr. 532). This blood matched Appellant (as did blood on the driveway and front step). Blood on the sidewalk matched DeJuan Thomas. (Tr. 639).

{¶9} A bullet jacket recovered from Thomas during surgery had characteristics consistent with the victim's .357 revolver. (Tr. 661-662). Ten fired .40 caliber cartridge cases were collected, mostly from one corner of the room. (Tr. 531). These were not fired from the revolver and were all fired from the same firearm. (Tr. 661). A bullet extracted from the victim's right wrist and three fired bullets recovered from the scene were inconsistent with the revolver and were all .40 S&W caliber or 10 mm auto caliber with the same class of characteristics (but there remained insufficient features to say they were fired from the same firearm). (Tr. 661, 665). A distinct fired bullet core was found lying on the floor near the victim. (Tr. 774). *This bullet core had a different direction of twist* (six lands and grooves with a left twist) than the revolver (five lands and grooves with a right twist) and the four other fired

bullets (a rare six-sided polygonal rifling-style with a right twist). (Tr. 662-663, 665-666). From this, the forensic scientist, testifying as a ballistics expert for the Bureau of Criminal Investigation ("BCI"), concluded at least three different firearms were used. (Tr. 664).

{¶10} The lead detective visited Appellant in the emergency room. Appellant said the story he told to the other detective and the first-responding officer was false and he wanted to tell the truth. He said his uncle called him, asked him to pick him up, and said they were going to Elm Street for a "bop." (Tr. 727). In the detective's experience, this was slang for a robbery. (Tr. 727, 733). The detective thus stopped the interview and went to his car to retrieve a *Miranda* rights waiver form, which he read to Appellant and his mother. (Tr. 727).

{¶11} Appellant told the detective they knocked on the victim's door and were invited in; he said he sat on the bed while Thomas and the victim argued in the hallway. (Tr. 729). Appellant told the detective "bop" meant drug deal. (Tr. 733). The detective believed Appellant changed the meaning after realizing he made a mistake by admitting they had intent to commit a robbery. (Tr. 761). Appellant told the detective the victim robbed Thomas by demanding Thomas give him what he had. At this point, Appellant said: he was shot; he ran outside; he heard more shots; he got in the car; his uncle stumbled out; and he dragged his uncle to the car. Appellant dropped his uncle off at a hospital guard shack. Appellant went home, and his sister drove him to a different hospital. (Tr. 730). He told the detective the victim had a "cowboy" gun (not an "automatic" weapon like the detective carried). (Tr. 732). Appellant's hands were swabbed for gunshot residue just before 1:30 a.m. Weeks later, the test result came back negative. (Tr. 815).

{¶12} When the detective arrived at work the next day, he had messages from Appellant saying he needed to speak with the detective immediately. The detective returned to the hospital and re-*Mirandized* Appellant. (Tr. 734). Appellant reported it was not the victim who robbed his uncle but was his uncle who robbed the victim. Appellant said he merely gave his uncle a ride and had no prior knowledge of the robbery. (Tr. 735). The detective asked Appellant to provide a video-statement at the police department after the hospital released him. (Tr. 735-736).

{¶13} Appellant came to the station with his parents and provided a corresponding video-statement which was played to the jury. (Tr. 747). In the video, Appellant said he was accompanying his uncle "to hit a bop" which he said was a "drug transaction." He saw a man with a child in a room on the opposite side of the hall from the room he entered. Appellant sat on the bed while his uncle and the victim talked in the hallway. He heard his uncle order the victim to "give the shit up," and the victim responded, "I ain't got nothin'." He said his uncle and the victim started wrestling and ended up in the room where Appellant was sitting on the bed. Appellant said the shot that hit him knocked him off the bed into the corner. He claimed he had no gun and they were still wrestling when he fled the room during which time he heard more shots.

{¶14} At the time Appellant provided these statements, it was believed DeJuan Thomas was dying. (Tr. 749). After Thomas recovered, Appellant changed his story and said there was no robbery. (Tr. 750-751). (DeJuan Thomas subsequently died before trial in a separate shooting incident). As for the person Appellant saw in a room with a child, the detective testified Laquawn Hopkins pled guilty to tampering with evidence. (Tr. 740, 782). It was elicited that Hopkins hid with his child in the backyard during the shooting, but he thereafter entered his room to remove photographs so he could not be connected with the situation. (Tr. 741).

{¶15} The detective believed the evidence suggested the collection of shell casings found in the corner were consistent with a gun being fired from Appellant's position in the room. He noted the evidence as to: the testimony about a third firearm producing a bullet core; the direction of cartridge ejection from a semi-automatic firearm; the blood evidence belonging to Appellant on the mattress, ceiling, and blinds; and Appellant's admitted position in the room (which we note included Appellant's statement he was knocked into a corner upon being shot). (Tr. 738, 774, 794-795). The detective said he filed the juvenile complaint against Appellant after speaking to an inmate.

{¶16} Jonathan Queener testified he was in the county jail with long-time friend DeJuan Thomas when Thomas said: he and Appellant went to rob the victim; he told Appellant they were going to get money and try to get drugs; the victim pulled

out a .357; they exchanged fire; and Appellant dropped him off at the hospital. (Tr. 564-565, 570). Queener acknowledged he benefited from a plea deal in return for his agreement to testify truthfully; his aggravated burglary charge was reduced to burglary, and the state recommended community control. (Tr. 561-562).

{¶17} Loraine McKinnon testified the victim lived with her when he was in his teens and was like a son to her. (Tr. 593, 596, 604). She also knew Appellant because he would visit his female cousin who stayed at her house; she said she loved Appellant (as she loved the victim). (Tr. 591, 599). This witness testified: Appellant apologized to her after the shooting; he told her he did not know they were going to "Kris's" house; and he explained his uncle called him to accompany him on an "easy lick," which she defined as a street term meaning to "rob someone." (Tr. 597-598). She explained she did not call the police upon learning this because Appellant was a child and his uncle was to blame; she voiced her story to a prosecutor who called her while preparing for trial. (Tr. 615). She noted the victim's guns had been stolen a couple weeks prior to his death. (Tr. 602).

{¶18} The jury found Appellant guilty of the four counts with the accompanying firearm specifications. Appellant was sentenced to twenty years to life for aggravated murder plus three years for the firearm specification. The other charges merged. Appellant filed a timely notice of appeal from the December 22, 2015 sentencing entry.

ASSIGNMENT OF ERROR ONE: HEARSAY & CONFRONTATION

{¶19} Appellant sets forth five assignments of error, the first of which states:

"The Trial Court erred in permitting a jailhouse snitch to testify to an alleged out-of-court statement made by a co-defendant in the trial of Defendant-Appellant as it both constituted inadmissible hearsay and violated his confrontation rights."

{¶20} This assignment of error deals with the testimony of Mr. Queener as to what DeJuan Thomas told him while they were both incarcerated in the county jail. Specifically, Appellant contests the admission of testimony that Thomas said he and Appellant went to the victim's house with intent to rob the victim of money and drugs. Appellant raises a hearsay argument and then a confrontation clause argument.

**{¶21}** Evid.R. 804(B) provides hearsay exceptions where the declarant is unavailable as a witness. A declarant is unavailable if he is deceased. Evid.R. 804(A)(4). One of the hearsay exceptions applicable to an unavailable declarant is the statement against interest exception contained in Evid.R. 804(B)(3), which provides:

> Statement Against Interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.

**{¶22}** Appellant does not contest the statement was against the interest of the declarant, DeJuan Thomas. Rather, he argues this rule does not apply to a co-defendant, citing ¶ 66 of the First District's *Webster* case and a concurring opinion in the Ninth District's *Wilson* case. In *Webster*, the court held this exception in Evid.R. 804(B)(3) does not apply to the defendant's attempt to introduce *his own statement*. *State v. Webster*, 1st Dist. No. C-120452, 2013-Ohio-4142, ¶ 66 (and holding Evid.R. 801(D)(2)(a) cannot be used by a party to introduce his own statement but is for introduction of an admission by a party-opponent). The concurring judge in *Wilson* cited *Webster* for the proposition that Evid.R. 804(B)(3) does not apply to statements of a party to the action. *State v. Wilson*, 9th Dist. No. 26683, 2014-Ohio-376, ¶ 63. Neither the *Wilson* case nor the *Webster* concurrence stand for the proposition that Evid.R. 804(B)(3) cannot be used to admit the statement of someone other than the defendant on trial merely because the declarant was alleged to be a participant in the offense and/or was indicted as a co-defendant. DeJuan Thomas was not a party to the trial of this case.

**{¶23}** Regardless, the Ohio Supreme Court permits the admission of hearsay statements against interest made by co-defendants who are unavailable. In *Yarborough*, a woman testified her husband (the mastermind of a plan who died before trial) told her he paid the defendant to have the victim killed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 41. In addition, a man testified this mastermind told him they should pay the defendant to kill the victim. *Id.* at ¶ 55. The Supreme Court found both statements were admissible under the statement against interest hearsay exception. *Id.* at ¶ 41-57. *See also State v. Issa*, 93 Ohio St.3d 49, 58-59, 752 N.E.2d 904 (2001) (where a subpoenaed co-defendant who refused to testify after pleading his rights under the Fifth Amendment was considered unavailable, his confession was admissible as a statement against interest). Appellant's initial argument is thus without merit.

**{¶24}** Appellant's next argument concerns the second part of Evid.R. 804(B)(3): "A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement." Appellant criticizes the credibility of Mr. Queener, emphasizing he testified in exchange for a generous resolution of his criminal case. However, the credibility of the witness providing the declaration of the unavailable declarant does not affect the statement's admissibility as the rule refers to "the truthworthiness of the statement," not the truthworthiness of the testifying witness. *State v. Landrum*, 53 Ohio St.3d 107, 114, 559 N.E.2d 710, 720 (1990) ("As the fact finder, the jury was responsible for assessing [his] credibility as a witness"), quoting Former Evid.R. 804(B)(3) (which used trustworthiness instead of truthworthiness as is used in the current rule).

**{¶25}** While the trial court was evaluating the admissibility of Mr. Queener's statement before trial, the state pointed to the anticipated testimony of Ms. McKinnon (that Appellant indicated to her he knew about the robbery before they arrived) and the testimony of the lead detective. As Appellant points out, the state's projection of the detective's anticipated testimony did not end up being accurate. In arguing corroboration, the state said Appellant told the detective they went to the victim's house to "hit a lick." (Tr. 26). Yet, it was Ms. McKinnon who said Appellant told her

he thought it would be an easy "lick" (which she understood to mean robbery). (Tr. 598). The detective testified Appellant told him they went for "a bop." (Tr. 727).

{¶26} In any event, Ms. McKinnon's statement provided corroboration. And, the detective's testimony, although not accurately portrayed in advance, also provided some corroboration, notwithstanding Appellant's insistence he used the word "bop" to mean drug transaction. The recovery of a .357 Magnum near the victim's fingertips is corroborative of the statement of Appellant's uncle to Mr. Queener. The DNA evidence demonstrating Appellant was shot while in the victim's bedroom where his body was found can be considered in conjunction with Appellant's own statement to police. Appellant's statement that his uncle robbed the victim just before the shooting was corroborative of his uncle's statement to Mr. Queener. Finally, in determining whether a statement is trustworthy, the Supreme Court has characterized as a corroborating circumstance the fact that a declarant "was not speaking to police and therefore was not trying to curry favor." *Yarbrough*, 95 Ohio St.3d 227 at ¶ 64. The Court recognized "jailhouse confessions to cellmates" may be "trustworthy and admissible." *Id.* (and then held the same cannot be said about a statement shifting blame from the declarant to others).

{¶27} The decision admitting the hearsay statement of the unavailable declarant pursuant to Evid.R. 804(B)(3) was within the discretion of the trial court. *Landrum*, 53 Ohio St.3d at 114. Under the totality of the circumstances in this case, the trial court did not abuse its discretion in finding Mr. Queener's testimony as to what DeJuan Thomas told him fell under the hearsay exception in Evid.R. 804(B)(3).

{¶28} Appellant also states the testimony violated his confrontation clause rights. The confrontation clause in the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In the past, an out-of-court declaration by an unavailable witness did not run afoul of the Confrontation Clause if it was accompanied by adequate "indicia of reliability." *See, e.g., Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (if the declaration "falls within a firmly rooted hearsay exception" or exhibits "particularized guarantees of trustworthiness").

**{¶29}** In 2004, the United States Supreme Court changed this test and held the confrontation clause prohibits the introduction of "testimonial" statements by a non-testifying witness (unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination). *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Non-testimonial hearsay was left to the hearsay law of the states. *Id.* at 68. The definition of "testimonial" pertains "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

**{¶30}** To determine if statements were testimonial the Court developed the "primary purpose" test. *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (consolidated cases involving statements made to law enforcement officer and to 911 operator). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* *See also Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) (clarifying how reviewing courts should consider all relevant circumstances; an ongoing emergency is only one factor in determining whether a statement was procured with a primary purpose of creating an out-of-court substitute for trial testimony). Notably, the Supreme Court described certain "statements from one prisoner to another" as "clearly nontestimonial" for the purposes of the confrontation clause analysis. *Davis*, 547 U.S. at 825.

**{¶31}** The Ohio Supreme Court has stated that in order to resolve confrontation questions for out-of-court statements made to those who are not law enforcement, Ohio adopted the "objective-witness test." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 160-161, citing *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus. Under this test, a statement is testimonial if an objective witness would have reasonably believed her statement would be available for use at a later trial; the focus is on "the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *Stahl*, 111 Ohio St.3d 186 at ¶ 36, quoting *Crawford*, 541 U.S. at 52 ("under

circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.").

**{¶32}** Recently, the United States Supreme Court reversed the Ohio Supreme Court's exclusion of evidence under the confrontation clause where a three-year-old told his preschool teacher his mother's boyfriend caused his injuries. The Ohio Supreme Court found the preschool teacher was acting as an agent of the state for law enforcement purposes because teachers have a statutory dual capacity as mandatory reporters and concluded the primary purpose of the statement was to collect evidence for trial. *State v. Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592, ¶ 4.

**{¶33}** The United States Supreme Court addressed the issue of whether statements to persons other than law enforcement officers are subject to the confrontation clause. *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015). The Court declined to categorically exclude statements to non-law enforcement from the confrontation clause's protection and applied the same test as applied to law enforcement. *Id.* In accordance, a statement cannot fall within the confrontation clause unless its primary purpose was testimonial. *Id.* at 2180. If such primary purpose did not exist at the time the statement was made, admissibility is left to the rules of evidence. *Id.*[1]

**{¶34}** The Court advised that statements to persons other than law enforcement officers "are much less likely to be testimonial than statements to law enforcement officers." *Id.* at 2181. The Court concluded, under all the relevant circumstances in the case, the child's statements to her preschool teacher "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution. Thus, their introduction at trial did not violate the Confrontation Clause." *Id.*

---

[1] The Court added: "But that does not mean that the Confrontation Clause bars every statement that satisfies the 'primary purpose' test * * * the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause." *Id.* at 2180-2181 (and stating the confrontation clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding).

**{¶35}** We note Justice Scalia wrote a separate concurrence (joined by Justice Ginsberg) wherein he agreed with employment of the usual test applicable to informal police interrogations and the result in the case. *Id.* at 2183-2184 (Scalia, J., concurring).[2] Justice Thomas wrote a separate concurrence to express his standard position that the confrontation clause only protects statements bearing "sufficient indicia of solemnity to qualify as testimonial" such as "formalized" statements. *Id.* at 2186 (Thomas, J., concurring).

**{¶36}** Applying this precedent, the admission of DeJuan Thomas's statement to an old friend while both were incarcerated which incriminated himself and Appellant in a robbery and homicide would not implicate the confrontation clause as the primary purpose of the statement was unrelated to creating evidence for prosecution. Pertinent circumstances include the fact the statement was not made to law enforcement or other authority and the statement was made to an old friend while both were incarcerated. Ohio confrontation clause law does not lead to a different conclusion.

**{¶37}** On this topic, Appellant adds an argument that Ohio law applying *Bruton* prohibits the introduction of his co-defendant's statement. *Bruton* held the admission in a joint trial of a non-testifying codefendant's confession which refers to the defendant violates the confrontation clause. *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968) (with a rationale being the confession may not have been voluntary and the incrimination of a co-defendant is suspect). Appellant points out the *Young* Court held the *Bruton* principle would be defeated if separate trials were granted and the co-defendant's statement was then read into evidence at the trial of the defendant. *State v. Young*, 5 Ohio St.3d 221, 225, 450 N.E.2d 1143 (1983). In addition, the *Moritz* Court stated it makes no difference if the statement is presented at trial by a private citizen who had no

---

[2] Justice Scalia wrote separately "to protest the Court's shoveling of fresh dirt upon the Sixth Amendment right of confrontation so recently rescued from the grave in *Crawford* * * *." *Id.* at 2184. Regarding the six-justice-majority's statement that the primary purpose test was merely one "necessary, but not always sufficient" condition for applying the Confrontation Clause, he called this statement dicta, "absolutely false," and "aggressive hostility to precedent." *Id.* at 2184-2185.

connection to law enforcement. *State v. Moritz*, 63 Ohio St.2d 150, 154, 407 N.E.2d 1268 (1980).

**{¶38}** However, case law has evolved. For instance, in *Yarbrough*, the mastermind declarant, who hired the defendant to kill the victim, died prior to trial. After finding the statement against interest hearsay exception applied, the Ohio Supreme Court found no confrontation clause issue with the admission of the declarant's statement to private citizens incriminating himself and the defendant. *Yarbrough*, 95 Ohio St.3d 227 at ¶ 46-54, 56 (and this was prior to *Crawford*'s testimonial standard). In any event, the *Bruton* principles were premised on the confrontation clause. As subsequent federal and Ohio state decisions have been rendered limiting the confrontation clause's application to testimonial statements, prior principles must be viewed under the lens of the intervening precedent. *See Clark*, __ U.S. __, 135 S.Ct. at 2180 ("a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial").

**{¶39}** In accordance, if the out-of-court statement of a non-testifying codefendant is not testimonial, then *Bruton* has no application because the confrontation clause has no application. "Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements." *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir.2009). *See also United States v. Vasquez*, 766 F.3d 373, 378 (5th Cir.2014); *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir.2013) ("*Bruton* is simply irrelevant in the context of nontestimonial statements * * * Statements that do not implicate the Confrontation Clause, a fortiori, do not implicate *Bruton*"); *United States v. Clark*, 717 F.3d 790, 816 (10th Cir.2013) ("the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements"); *United States v. Berrios*, 676 F.3d 118, 128 (3d Cir.2012) (because "*Bruton* is no more than a by-product of the Confrontation Clause," it is inapplicable to a non-testimonial prison yard conversation).

**{¶40}** Appellant also suggests the Ohio Constitution provides more protection. Ohio's confrontation clause provides: "In any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *." Article I, Section 10 of

the Ohio Constitution (but allowing the use of a deposition in a criminal case upon "securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court.").

**{¶41}** Appellant points to the Ohio Supreme Court's *Storch* case, which said "the presumption mandated by Section 10, Article I is that a child will be required in most circumstances to testify 'face to face' with the individual being accused." *State v. Storch*, 66 Ohio St.3d 280, 293, 612 N.E.2d 305 (1993). *Storch* was issued in the context of Evid.R. 807, dealing with child statements in abuse cases. The Court concluded "Evid.R. 807 accords with the right of confrontation guaranteed by both Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the Constitution of the United States." *Id.* at paragraph one of the syllabus. Before coming to this conclusion, the *Storch* Court expressed:

> For many years, the rights to confrontation set forth in the respective Constitutions were construed as being the same, in part because the right to confrontation in the Sixth Amendment was considered by the United States Supreme Court to require face-to-face confrontation in most circumstances. In the last thirteen years, the United States Supreme Court has drifted away from that requirement in a series of cases starting with *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597.

*Storch* was written more than a decade before *Crawford* and *Davis*. As aforementioned, the *Ohio v. Roberts* case cited in *Storch* was changed by *Crawford*, which has been followed in Ohio as well.

**{¶42}** In any event, a later case out of the Ohio Supreme Court has reiterated the Court's prior position that "Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12, quoting *State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990). Consequently, Appellant's final argument is without merit. This assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO:  RACE

**{¶43}** Appellant's second assignment of error contends:

"Appellant was denied equal protection of the laws and his rights under the Fourteenth Amendment as a result of systematic removal of African-American jurors and the racially-based appeal of the prosecution."

**{¶44}** Appellant protests the removal of the only three African-American members of the jury pool, which we shall refer to as prospective jurors one, two, and three, corresponding to their order of removal.  Appellant raises the test in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), mainly with regards to prospective juror two.

**{¶45}** As for prospective juror one, the trial court received information the prospective juror spoke to Appellant's mother outside of the courthouse after the first day of voir dire.  Upon questioning the next day, prospective juror one said:  he spoke to Appellant's mother because she looked like his cousin's mother; he thought he recognized her; he asked her if she knew someone he knew; she said she heard of the person; and she thought the prospective juror looked familiar as well.  (Tr. 267-268, 272-273).  Prospective juror one saw the woman in the courtroom that day but said he did not know she was Appellant's mother.  (Tr. 269).  Appellant was present during the conversation; he was sitting on the steps reading a newspaper while the prospective juror talked to his mother.  (Tr. 269, 274).  The court noted Appellant left because he did not "want to hear any of the conversation after it began."  (Tr. 274-275).

**{¶46}** The prosecutor asked the court to remove this prospective juror for cause.  (Tr. 271).  The defense expressed doubt the occurrence rose to this level of concern.  The court excused the prospective juror.  Defense counsel thereafter asked the record to reflect the prospective juror was one of three African-Americans out of a panel of 35 or 40 people.  (Tr. 275).  Counsel stated he wished "to make sure this was not the beginning of a systematic attempt by the state to remove all people of color."  The court rejected this suggestion, pointing out:  "The impetus of this inquiry was by the court."  The court emphasized the appearance of impropriety in speaking to the defendant's mother (especially after seeing her sitting in the courtroom

separate from the jury panel) and expressed concern over the potential effect of this on the other jurors if this prospective juror were to remain on the jury. (Tr. 277). The judge also pointed out how court was adjourned early the day before to accommodate this very prospective juror who said he had to handle a family matter immediately (but then went outside and struck up a conversation with Appellant's mother). (Tr. 157, 276).

**{¶47}** As the state points out, the *Batson* test is inapplicable as this was not a peremptory challenge. *See State v. Lewis*, 7th Dist. No. 03 MA 36, 2005-Ohio-2699, ¶ 60 ("*Batson v. Kentucky* applies to peremptory challenges, not challenges for cause"). The state challenged this prospective juror for cause. Various "good causes for challenge to any person called as juror" are listed in R.C. 2313.17(B)(1)-(9). *See also* R.C. 2313.18(C) ("Each challenge listed in division (B) of this section shall be considered as a principal challenge, and its validity tried by the court."). For instance, there is good cause for challenge if "the person discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court." R.C. 2313.17(B)(9).

> In addition to the causes listed in division (B) of this section, any petit juror may be challenged on suspicion of prejudice against or partiality for either party, or for want of a competent knowledge of the English language, *or other cause that may render the juror at the time an unsuitable juror*. The validity of the challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased.

(Emphasis added.) R.C. 2313.17(D). A trial court's ruling on a challenge for cause will not be disturbed absent an abuse of discretion. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 94.

**{¶48}** The removal of this juror for cause was not unreasonable, arbitrary, or unconscionable. In any event, the court's decision on this one prospective juror does not appear to be independently challenged here. Rather, it appears the removal of

this prospective juror is used to portray the context of cumulative events, including the peremptory challenge of prospective juror two.

{¶49} Prospective juror two advised she was not comfortable with a certain example of complicity. When the court asked if she could follow the law provided to her by the court, she said she could. (Tr. 293). When the court asked if she could accept a certain principle of complicity, she answered no. The court said it appreciated her honesty. (Tr. 294). The court asked the prosecutor if she was going to ask to remove the prospective juror two for cause, at which point a discussion was held off the record. (Tr. 295). The court then prompted the juror to clarify that she said she could not apply the law on complicity to a person who did not "do" the shooting. She further stated she would not be able to find a person guilty even if his act constituted complicity under the law. (Tr. 296). Defense counsel then asked prospective juror two if she could follow the law, and she said she could. (Tr. 296-297). She then said she could find a driver guilty if he knew the principal was going in a store to rob it. (Tr. 297-299). She answered she would not want to find him guilty, but she could if she had to. (Tr. 300). The court overruled any challenge for cause.

{¶50} When the state exercised a peremptory challenge to remove prospective juror two, defense counsel pointed out this was an African-American juror who indicated she could follow the law when questioned further. (Tr. 313-314). The prosecution explained: the prospective juror had confusion over the law provided to her; she plainly stated she does not want to comply with the law; her answer changed several times; and there were concerns about her ability to understand the law. (Tr. 315).

{¶51} The court agreed prospective juror two "made it clear that she would not want to find somebody guilty, even though the law required it." It was recognized she eventually said she could apply the law to find one guilty although she did not want to in certain complicity situations. (Tr. 316). The court overruled the *Batson* objection and expressed it did not believe the prospective juror's statements that she would employ the concept of complicity in accordance with the law. (Tr. 316-317). In so doing, the court found the prosecution's concerns credible.

**{¶52}** The defendant has the burden to prove the state racially discriminated in the use of a peremptory challenge. *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.E.2d 69 (1986). The evaluation of a *Batson* claim involves three components: (1) the defendant sets forth a prima facie case of racial discrimination; (2) the state is then mandated to set forth a race-neutral reason for the exercise of the peremptory challenge; and (3) the trial court must decide whether the prosecutor purposefully discriminated. *See id.* at 97-98. As the state points out, the preliminary issue of whether the defendant made a prima facie showing becomes moot if the state offers a race-neutral explanation for the peremptory challenge and the trial court rules on the ultimate question of intentional discrimination. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999).

**{¶53}** Under the second step, the state must provide a racially neutral explanation for the challenge, and the court "assum[es] the proffered reasons for the peremptory challenges are true." *Hernandez*, 500 U.S. at 359. A race-neutral explanation for a peremptory challenge is simply "an explanation based on something other than the race of the juror." *Id.* at 360. At this stage, the state's explanation need not be "persuasive, or even plausible" as long as the reason is not inherently discriminatory. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (where the state exercised a peremptory challenge against an African–American female based on a fear that a young single citizen with no ties to the community might be too tolerant of the crime at issue). In fact, the state's reason can be silly or superstitious as long as it is not race-related; an evaluation of the persuasiveness of the explanation does not arise until the third step. *Purkett v. Elem*, 514 U.S. 765, 768-769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (long unkempt hair and facial hair is race neutral). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768.

**{¶54}** The state's reason for exercising the disputed peremptory challenge need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97. As aforementioned, a challenge for cause exists if, among other reasons, "the person discloses by the person's answers that the person cannot be a fair and impartial juror

or will not follow the law as given to the person by the court." R.C. 2313.17(B)(9). "If the juror's answers fluctuate as to whether they rise to this level or not, the state can still be concerned and express that it is uncertain whether the juror will follow the law." *State v. Prieto*, 7th Dist. No. 15 MA 0200, 2016-Ohio-8480, ¶ 44. Equivocal answers or expressions of uncertainty on impartiality or matters pertinent to the case are sufficiently race-neutral reasons for exercising a peremptory challenge. *See, e.g., State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 65; *White*, 85 Ohio St.3d at 437.

**{¶55}** If the state provides a race-neutral explanation, the trial court must view all the circumstances and determine whether there was purposeful discrimination, i.e., whether the explanation was merely pretextual. *Batson*, 476 U.S. at 98. Although this step entails evaluating the persuasiveness or genuineness of the state's explanation, the burden of persuasion regarding racial motivation remains on the defendant. *Collins*, 546 U.S. at 338; *State v. Gowdy*, 88 Ohio St.3d 387, 393, 727 N.E.2d 579 (2000).

**{¶56}** The reviewing court must defer to the trial court's credibility decision. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 110. The trial court's decision is partially based upon the prosecutor's demeanor in explaining her position; whether the prosecutor's explanation is genuine is a credibility determination subject to great deference. *Davis v. Ayala*, __ U.S. __, 135 S.Ct. 2187, 2199, 2201, 192 L.Ed.2d 323 (2015). "Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation." *Id.* at 2201, quoting *Collins*, 546 U.S. at 343 (Breyer, J., concurring). We do not reverse a trial court's decision on intentional discrimination unless the court was clearly erroneous in accepting the state's explanation as genuine (as opposed to pretextual). *See Ayala*, __ U.S. __, 135 S.Ct. at 2199; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 64.

**{¶57}** Appellant argues other prospective jurors (who were white) reacted similarly to complicity questions. The state responds by asserting no other prospective juror was unwilling to follow the law on complicity and urges this court to give great deference to the trial court's decision finding the prosecutor's reason was

not pretextual. To show other (white) jurors expressed issues or confusion on complicity, Appellant cites to various portions of the transcript.

{¶58} For instance, Appellant cites to pages 249-259. However, the prospective juror being questioned in those pages was in fact subsequently removed by a peremptory challenge exercised by the state. (Tr. 292). A different prospective juror cited by Appellant indicated she could understand and follow the law on complicity. (Tr. 336-337). Another prospective juror asked for clarification on a provided complicity scenario but then expressed understanding of the concept. (Tr. 152-154). The other example Appellant cites was a prospective juror who decided to tell a story from his youth and ask if he was complicit in a theft when he drove away knowing someone stole something after the fact. (Tr. 346-350). He then stated he understood the law and expressed, "I believe that it's maybe not a law that is totally fair, but it is what is; you know? That's for a legislator to change." (Tr. 351).

{¶59} This court concludes the reason provided by the prosecution for exercising a peremptory challenge as to prospective juror two was properly deemed to be race-neutral. At stage two of the *Batson* analysis, the state's explanation need not be "persuasive, or even plausible" (and can be silly or superstitious) as long as the reason is not inherently discriminatory. *Rice*, 546 U.S. at 338; *Purkett*, 514 U.S. at 768-769 (an evaluation of the persuasiveness of the explanation does not arise until the third step). As for stage three of the *Batson* analysis, neither the prosecution nor the trial court believed the juror's answers to certain complicity questions. The court found the prosecutor's concerns (due to prospective juror two's abrupt turnabout) were credible, were honest, and were not pretextual. The trial court's decision in overruling Appellant's *Batson* challenge to the state's peremptory challenge of prospective juror two is not clearly erroneous.

{¶60} After this juror was removed, prospective juror three was addressed. She was the last remaining African-American venireperson. She had previously advised the court her finals started that very week in the nursing program at Eastern Gateway, at which time the court called a sidebar and advised it would reserve making a judgment on her removal. (Tr. 81-82). Upon subsequently being placed in the jury box, prospective juror three explained: she had two nursing finals; she is not

supposed to miss a final; she has no control over scheduling the finals; and her instructor advised she would provide a letter as proof. Prospective juror three advised she had class the next day, stating she would get kicked out of the program if she is not in class. (Tr. 320). The judge suggested he would call the school to ask the instructors to allow the juror to take both finals next week, instead of one this week and one next week. (Tr. 319-320). (We note the trial proceeded over the course of five days the first week and two days the next week).

{¶61} A discussion was held with counsel off the record. The court then told the juror it was "torn" between wanting her to go to school and wanting diversity on the jury. The court said it was calling a recess to make phone calls to her school to investigate rearranging her schedule. (Tr. 321-322). Prospective juror three asked to speak about other matters and she was heard on the record in chambers with Appellant and counsel present. She disclosed other issues with the case besides her school schedule. For instance, she stated: "I have a major problem with this case because I have two family members that's not even to top all my family members, that were murdered." (Tr. 323). In addition, she previously worked as a nurse at the jail and had to look at her cousin's murderer every day when she went to work. (Tr. 324, 326). When the court asked if she had resentment toward the defendant, she answered she did not want to be unfair to him. The court asked if she could fairly and objectively make a decision based on the facts of the case. She answered, "I can't honestly say that I could" and "It would be very hard for me." (Tr. 325-326).

{¶62} Upon questioning by defense counsel, prospective juror three reiterated, "because of my personal experiences that I cannot honestly say that I can sit here and listen to all the evidence and honestly say, okay he's innocent. I can't. I really can't do that." She then disclosed she also had a family member who drove a person who killed her other family member. (Tr. 327). She repeated her belief that her presence on the jury would not be fair to the defendant. (Tr. 328). The prosecutor noted it had already expressed the state's position that prospective juror three should be excused for her educational issues. (Tr. 329). When the court asked for the defense's position, defense counsel answered, "Nothing more, Your Honor." The court wished the prospective juror luck in school, essentially excusing her from

service. At this point, she added she knew two of the witnesses from working at the jail and did not perceive them to be credible. (Tr. 329). Defense counsel voiced, "Then we do want her on, Your Honor." The court then excused the juror, again. (Tr. 330).

{¶63} On appeal, Appellant contends other prospective jurors expressed issues with work and commitments but were not removed, citing pages 79 through 88. However, within these pages, the court removed a juror who was leaving on a driving trip that week and a juror who did not want her child getting off the bus alone, without objection; other jurors' concerns were alleviated by the prediction of how long the trial would take. (Tr. 84, 87).

{¶64} In addition, prospective juror three was not only excused due to her college schedule (she would miss what seemed to be her last class before finals plus two final examinations, which would be valid considerations), she was removed for other reasons as well, which are not argued to constitute invalid considerations. As the state points out, the court excused juror three for cause, making *Batson* inapplicable. The trial court expressly made every effort to keep prospective juror three on the jury, and she kept providing new reasons to be removed. Considering the entire exchange, there is no indication the court abused its discretion in removing juror three.

{¶65} Lastly, Appellant argues: "with all the African-American jurors removed, the prosecution made an explicitly race-based appeal to the all white jury during the rebuttal portion of its closing argument" which "constituted prosecutorial misconduct that prejudiced Kalontae and denied him a fundamentally fair trial." (Apt. Br. 13-14, 18). In reviewing a claim of prosecutorial misconduct in closing argument, the reviewing court is to evaluate whether remarks were improper and, if so, whether they prejudicially affected the defendant's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). The prosecution is afforded wide latitude in summation. *Id.* Furthermore, "[n]ot every intemperate remark by counsel can be a basis for reversal." *State v. Landrum*, 53 Ohio St.3d 107, 112, 559 N.E.2d 710 (1990) (the question is the fairness of trial, not the culpability of the prosecutor). The state's closing argument must be viewed in its entirety. *State v. Treesh*, 90 Ohio

St.3d 460, 466, 739 N.E.2d 749 (2001). "It has been observed that comments made in direct response to arguments advanced by opposing counsel are unlikely to constitute a ground for reversal." *Cosgrove v. Omni Manor*, 7th Dist. No. 15 MA 0207, 2016-Ohio-8481, ¶ 57, citing, *e.g.*, *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996) (holding the defendant "can scarcely complain" where his counsel had previously and repeatedly used variations of the same language contested by the defendant).

**{¶66}** Where the defense did not object to a statement in the prosecution's closing argument, we can review only for plain error. *State v. Ballew*, 76 Ohio St.3d 244, 254-255, 667 N.E.2d 369 (1996). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Landrum*, 53 Ohio St.3d at 111, quoting *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804 (1978), paragraph three of the syllabus. An appellate court's invocation of plain error is discretionary and requires the existence of an obvious error which affected substantial rights. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23.

**{¶67}** Appellant contests the following portion of the prosecution's rebuttal: "No testimony to this. Just [counsel] telling you that's what it means. And, of course, you know, you're white. And [the detective] is white. You guys must be racist. I'm ashamed that a fellow attorney will play that card when the evidence is clear, the only evidence as to what a bop is, the only evidence whatsoever is from [the detective]." (Tr. 867). Appellant believes these comments about race "derided the integrity of opposing counsel" and constituted "an obvious appeal to a decision based on race." He concludes it violated his rights to a fair trial when viewed in the context of the three removed African-American prospective jurors.

**{¶68}** It is important to read this portion of the state's rebuttal in context rather than in isolation. Defense counsel's closing argument began with: "The only time race is a factor in this case is right now, at the opening of my discussion with you. Because what the prosecutors want you to think and what that detective wanted you to think is something other than every person of color in this room knows, that a bop is buying our pot. It's not a robbery." Defense counsel continued, "And it doesn't

matter how many times these two white prosecutors say it or that white detective says it, hoping that you all as white jurors from the suburbs won't know that. The fact is, always has been, always will be, that a bop is buying our pot. It's the process by which you get marijuana." (Tr. 845).

**{¶69}** Considering the fact the state was responding to these comments by defense counsel and viewing the state's closing argument in its entirety, the contested statement in the prosecutor's rebuttal did not deprive Appellant of a fair trial. Error is not apparent, plain or otherwise. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR THREE: ASSISTANCE OF COUNSEL</u>

**{¶70}** Appellant sets forth various arguments on trial counsel's performance within his third assignment of error which states:

"Appellant was denied effective assistance of counsel."

**{¶71}** We review a claim of ineffective assistance of counsel under a two-part test, which requires the defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both prongs must be established; if the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶72}** In evaluating the alleged deficiency in performance, our review is highly deferential to counsel's decision as there is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance. *Bradley*, 42 Ohio St.3d at 142-143, citing *Strickland*, 466 U.S. at 689. We are to refrain from second-guessing the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Instances of debatable trial strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). There are "countless ways to provide effective assistance in any given case." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 689.

**{¶73}** To show prejudice, a defendant must prove his lawyer's errors were so serious that there is a reasonable probability the result of the proceedings would have been different. *Carter*, 72 Ohio St.3d at 558. Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d 136 at fn. 1, quoting *Strickland*, 466 U.S. at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding fundamentally unfair due to the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**{¶74}** Related to the first assignment of error, Appellant complains defense counsel failed to file a written motion in limine and failed to thoroughly argue against the admissibility of the "jailhouse snitch" who presented the hearsay statement of the deceased co-defendant. The state filed a notice of intent to use evidence in the form of Mr. Queener's testimony as to what DeJuan Thomas told him in jail. At the beginning of the trial, the court noted it had researched the law on the topic. (Tr. 20). The state argued the declarant was clearly unavailable as he was dead and there was nothing to indicate the declarant should have anticipated his statement would be used in a prosecution when he spoke to his friend in jail, concluding the statement was not testimonial. (Tr. 24-25). The state then made arguments concerning the credibility and corroboration of the declarant's statement. (Tr. 26-27).

**{¶75}** Defense counsel made arguments concerning the credibility of the "jailhouse snitch" and a witness whose testimony was used as corroboration of the declarant's statement. (Tr. 29, 31-34). The court concluded these would be credibility issues for trial. (Tr. 30, 34). Mid-trial, defense counsel asked the court to reconsider its ruling on admissibility. He provided the 1983 Ohio Supreme Court *Storch* case, discussed above, and argued the Ohio Constitution precludes testimony at trial without face-to-face confrontation. (Tr. 499-504). Prior to Mr. Queener's testimony, defense counsel renewed his objection again. (Tr. 558).

**{¶76}** Defense counsel made arguments against admissibility of the disputed testimony before and during trial. These arguments were reiterated in Appellant's

brief. Although other arguments were added on appeal, they are without merit. Considering the resolution of the first assignment of error, this ineffective assistance of counsel argument fails.

**{¶77}** Appellant also argues counsel should have filed a motion to suppress his statements to police based on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Counsel's failure to file a motion to suppress does not constitute ineffective assistance of counsel per se. *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. Defense counsel's failure to file a motion to suppress is subject to the typical two-pronged *Strickland* analysis for claims of ineffective assistance of counsel: deficient performance and prejudice. *State v. Spaulding*, __ Ohio St.3d __, 2016-Ohio-8126, __ N.E.3d __, ¶ 94, citing *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

**{¶78}** More specifically, where a defendant complains trial counsel failed to file a suppression motion, the defendant must prove there was a valid ground to suppress the evidence in dispute. *Spaulding*, __ Ohio St.3d __, 2016-Ohio-8126 at ¶ 94, citing *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. The defendant must also show there is a reasonable probability the result of the trial would have been different if the evidence had been suppressed. *Spaulding*, __ Ohio St.3d __, 2016-Ohio-8126 at ¶ 94. A claim of ineffective assistance of counsel in a direct appeal must be established by the evidence in the record. *See, e.g., State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001) (if establishing ineffective assistance of counsel requires proof outside the record, then such claim is not appropriately considered on direct appeal); *State v. Ishmail*, 54 Ohio St.2d 402, 406, 377 N.E.2d 500 (1978) (the appellate court is limited to what transpired as reflected by the record on direct appeal). *See also State v. Gervin*, 3d Dist. No. 9-15-51, 2016-Ohio-5670, ¶ 23 (if the record developed at trial is inadequate to support the unraised suppression argument, the ineffective assistance of counsel fails).

**{¶79}** Appellant's ineffective assistance of counsel argument is based on his claim that he was not *Mirandized* before his initial statements made in the hospital. Appellant's first statement was made to a police officer in the hospital while waiting for his arm to be treated: he said he was walking on Norwood Avenue when an

unknown person in a car shot him. (Tr. 462-462). Appellant's second statement, which was made to a detective in the emergency room, was consistent with the first statement. (Tr. 492). In both instances, Appellant was reporting he was the victim of a crime. Appellant is presuming *Miranda* warnings were not given before these two statements due to the absence of testimony on the topic; however, testimony on warnings is not required at trial, and the police officer and the detective were not asked at trial whether *Miranda* warnings were provided before these two statements. In any event, there is no indication a reasonable person would have believed a *custodial* interrogation was occurring, which is the trigger for *Miranda* rights. *State v. Mason*, 82 Ohio St.3d 144, 153-154, 694 N.E.2d 932 (1998), citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 313, 882 L.Ed.2d 317 (1984).

**{¶80}** Appellant's third statement was made to the lead detective in the emergency room. Appellant's mother was present. (Tr. 726). Appellant proclaimed he lied to the other officers and stated his uncle called him so they could go to Elm Street "for a bop." Since the detective understood this to mean a robbery, he stopped the conversation and went to his vehicle to retrieve a *Miranda* rights waiver form. (Tr. 727). The detective read Appellant his rights in the presence of his mother and made sure they both understood the rights being waived. (Tr. 727-729). Appellant stated they went to the victim's house for a drug buy and the victim robbed his uncle resulting in a shoot-out.

**{¶81}** As for the portion of the statement made prior to the *Miranda* waiver, Appellant had reported he was the victim of a drive-by shooting. There is no indication this statement, made when the lead detective first approached Appellant in the hospital, could be considered a custodial situation so as to trigger the application of *Miranda*. *See Mason*, 82 Ohio St.3d at 153-154. Police are not required to administer *Miranda* warnings to everyone they question, even if the subject has become a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997).

**{¶82}** In the morning, the detective heard multiple messages from Appellant asking him to come back to the hospital, and the detective complied. The detective *Mirandized* Appellant again. Appellant then stated DeJuan Thomas robbed the victim; Appellant said he did not know this was going to occur. (Tr. 734-735). The

detective asked him to memorialize this statement in a recording after he was released from the hospital. (Tr. 735). On May 2, 2013, Appellant arrived at the police station with his parents, was *Mirandized*, and provided a similar statement on video in the presence of his father. (Tr. 744).

**{¶83}** Appellant does not detail an issue with the *Mirandized* statement he provided upon summoning the detective back to the hospital. We notice the statement of facts section of his brief describes this statement and adds, "apparently in the absence of any parent." Appellant provides no law mandating a parent's presence during *Miranda* warnings or disposing of the totality of the circumstances test. Regardless, there is no indication this encounter could be viewed as a custodial interrogation. Appellant, who was 17.5 years old, summoned the detective back to the hospital. In addition, Appellant was previously *Mirandized* a few hours earlier in the presence of his mother, who was also advised about the rights being waived.

**{¶84}** There is no indication a suppression motion would have been successful. Furthermore, counsel could have made a tactical decision to not seek suppression because he wanted the jury to hear Appellant's claim that he did not know a robbery would be committed by his uncle. The final statement Appellant gave from the hospital resulted in and was memorialized in the subsequent video-statement, which counsel may have wished the jury to see so they could view his client telling his story without having to testify at trial and being subject to cross-examination.

**{¶85}** Next, Appellant contends defense counsel was ineffective as he asked to watch the video of Appellant's statement before it was played for the jury (due to his concerns it contained some irrelevant portions) and then made no objections as it was played at trial even though the court said he could. Before the video was played, defense counsel said he believed some portions may not be relevant. The court asked him to put on the record what he believed was irrelevant, and defense counsel asked to watch the video again. (Tr. 745-746). The court denied this request and advised counsel to object as the video was played at which point the court would stop the video and rule on the objections. (Tr. 746). The video was then played for the jury; the record does not show the voicing of objections during its playing. (Tr. 748).

**{¶86}** Contrary to Appellant's suggestion, counsel said he previously watched the video upon its provision in discovery. Additionally, defense counsel noted: "we're down to about 36 minutes you want to show." (Tr. 745). The cut of the video played by the state at trial may have satisfied defense counsel's concerns. As the state points out, the video involved an admission by a party-opponent under Evid.R. 801(D)(2)(a), which is not hearsay. Furthermore, Appellant does not allude to any portion of the video he contends should have been the subject of a relevancy objection under Evid.R. 402, which provides: "All relevant evidence is admissible [except as otherwise provided]. Evidence which is not relevant is not admissible." The mere fact the aforementioned exchange occurred between the court and defense counsel does not demonstrate ineffective assistance of counsel.

**{¶87}** Next, Appellant complains defense counsel did not object to the lead detective's testimony that a "bop" was a robbery as the detective had not been qualified as an expert under Evid.R. 702. The lead detective first visited Appellant, who was accompanied by his mother, in the emergency room. Appellant disclosed he received a call from his uncle and "was going to pick him up to bring him over to Elm Street for a bop." (Tr. 727). The detective testified he stopped speaking to Appellant and went to retrieve a *Miranda* waiver form because he knew the word "bop" to mean a robbery. (Tr. 727-728). He said Appellant advised he meant drug deal by the term "bop." The detective explained: "Over my years of experience and working different types of crimes, including robbery, that's the slang that I'm accustomed to that usually people come in that describe a robbery describe it as a bop. It's just street slang." (Tr. 733). He had already testified he worked for the Youngstown Police Department for 23 years. (Tr. 720).

**{¶88}** A witness may testify as an expert if: (A) the testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education on the subject matter; and (C) the testimony is based on reliable scientific, technical, or other specialized information. Evid.R. 702 (with additional rules for test results). A lay witness can also provide an opinion. Evid.R. 701 provides: "If the witness is not

testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

**{¶89}** "[A] police officer is permitted to testify concerning his own expertise as to the behavioral and language patterns of people commonly observed on the streets, including people associated with criminal activities, in a manner helpful for the jury's clear understanding of the factual issues involved." *State v. Barnett*, 10th Dist. No. 92AP-345 (Sept. 22, 1992) ("In particular, the police officer's knowledge of the slang terminology usually accompanying drug transactions is permissible."). *See also State v. Mason*, 5th Dist. No. 2003CA00438, 2004-Ohio-4896, ¶ 23-35 (detective was permitted to testify that "40" in certain context referred to $40 worth of crack cocaine). *State v. Scott*, 10th Dist. No. 90AP-255 (Sept. 27, 1990) (police officer could relate his knowledge of the slang terminology, nods, and gestures accompanying drug transactions).

**{¶90}** Counsel was not ineffective in failing to object to the detective's testimony as to what he believed the slang word "bop" meant on the street. In fact, it appears defense counsel made a tactical decision to wait to cross-examine the detective on the subject as he asked the detective, "Have you ever heard that a bop is * * * a blow job? * * * a woman who gives a good blow job * * * to take off? * * * to hit something? * * * a girl is a bop?" (Tr. 759).

**{¶91}** Lastly, Appellant claims counsel rendered ineffective assistance by refraining from cross-examining the ballistics expert from the BCI who concluded three firearms were used in producing the ballistics evidence recovered from the scene. A bullet core with the different direction of twist and rifling style was found lying on the floor near the body of a homicide victim who had been shot eleven times. Appellant urges the expert's conclusion was ripe for challenge as the bullet core may have predated the crime and there was a tampering with evidence charge related to the crime scene. Notably, Appellant is not contesting the conclusion that three firearms produced the evidence sent to BCI; rather, he is contesting the investigative conclusion as to the time and place of the third firearm's production of the bullet core.

In accordance, defense counsel raised these issues during cross-examination of the lead detective. (Tr. 774, 779-782). Counsel should not be second-guessed as to his decision on which witness he chose to ask about alternative explanations for the existence of a projectile fired from a third firearm.

**{¶92}** For all of the foregoing reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR: SUFFICIENCY & WEIGHT

**{¶93}** The argument section under Appellant's fourth assignment of error is divided into two distinct sections, sufficiency of the evidence and weight of the evidence. The assignment of error provides:

"Appellant's conviction * * * was against the Manifest Weight of the Evidence and not supported by sufficient evidence."

**{¶94}** If a conviction is not supported by sufficient evidence, the defendant cannot be retried as jeopardy attached. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997) (unlike a case reversed on weight of the evidence, which can be retried), citing *Tibbs v. Florida*, 457 U.S. 31, 41, 47, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). All evidence offered by the State and admitted by the trial court, whether erroneously or not, can be considered to determine whether the evidence was sufficient to sustain the guilty verdict. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 16-20, citing *Lockhart v. Nelson,* 488 U.S. 33, 35, 38, 40-42 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

**{¶95}** Whether the evidence is legally sufficient to sustain a conviction is a question of law. *Thompkins*, 78 Ohio St.3d at 386. It is a test of adequacy. *Id.* An evaluation of a witness's credibility is not involved in a sufficiency review. *State v. Yarbrough*, 95 Ohio St.3d 227, 240, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Rather, the question is whether the evidence, *if believed*, is sufficient. *See id.* at ¶ 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *See Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *See State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on grounds

of sufficiency unless the reviewing court determines that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

{¶96} In making his sufficiency argument, Appellant refers only to the offense of aggravated murder. The elements of the type of aggravated murder charged in this case are: purposely causing the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit aggravated robbery. *See* R.C. 2903.01(B) (or other listed offenses including robbery, aggravated burglary, burglary, and trespass in a habitation when a person is present or likely to be present). Appellant takes issue with the element of purpose, arguing there was insufficient evidence he had purpose to cause the victim's death.

{¶97} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). Appellant believes the only evidence suggesting purpose was the testimony concluding three guns must have been involved due to a bullet found on the floor of the crime scene which was not fired from the same firearm as two other sets of bullets. He concludes this was not enough to indicate he purposely caused the victim's death, suggesting this bullet could have predated the shooting and noting the testimony as to tampering with the scene.

{¶98} The jury found Appellant guilty of aggravated murder. This verdict form instructed the jury to skip an attached complicity verdict form in the case of a guilty verdict; thus, a verdict form specifically mentioning complicity was not reached. Because a person who is complicit in the commission of an offense can be prosecuted and punished as if he were a principal offender, complicity need not be charged in the indictment and can be stated in terms of the principal offense. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 181; R.C. 2923.03(F). The state must show the complicit defendant shared the criminal intent of the principal, and this intent may be inferred from the circumstances surrounding the crime and from the defendant's conduct before, during, and after the offense. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001).

{¶99} The principal defendant's intent can also be ascertained from the surrounding facts and circumstances. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Circumstantial evidence has the same probative value as direct evidence. *Id.* "A firearm is an inherently dangerous instrumentality, the use of which is likely to produce death, and a jury could reasonably infer from all testimony presented that a defendant formed the specific intent necessary to commit murder." *State v. Dickerson*, 7th Dist. No. 96 C.A. 150 (Mar. 30, 1998) (where defendant argued insufficient evidence of purpose), citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982).

{¶100} The evidence, *if believed*, was sufficient to prove Appellant's purpose to cause the victim's death. *See Yarbrough*, 95 Ohio St.3d 227 at ¶ 82; *Murphy*, 91 Ohio St.3d at 543. Viewed in the light most favorable to the state, the evidence shows: Appellant intended to go to the victim's house with his uncle to rob the victim of money and drugs; Appellant picked up his uncle, drove to the victim's house, and entered the house; Appellant admitted his position near the bed; his blood was found on the bed and spattered behind it, confirming his location when he was shot at very close range, an apparent contact wound; Appellant stated the shot knocked him into the corner; the victim had a revolver near his fingertips which contained five fired cartridges and one bullet remaining; Appellant's DNA was found on the handle of this revolver; the victim was shot eleven times with entry wounds on multiple sides of his body; the ballistics evidence demonstrated three different firearms produced the evidence collected; the single bullet core showing the presence of a third firearm was found lying on the floor near the body; multiple casings were clustered in a location consistent with being ejected from a firing semi-automatic handgun located near Appellant's position; Appellant fled after the victim was killed, dropping his uncle off in critical condition at one emergency room and then driving to a different emergency room to have his own massive gunshot wound to the arm treated; and Appellant told various progressive stories to police, ending with a retraction.

{¶101} The question is merely whether any rational mind (with an emphasis on *any*) could find the disputed element was established by the direct and circumstantial evidence. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866

(1998). Upon viewing the evidence in the light most favorable to the prosecution, a rational juror could have found the elements of the contested offense proven beyond a reasonable doubt. *See Goff*, 82 Ohio St.3d at 138. Appellant's sufficiency argument is overruled.

{¶102} As to weight of the evidence, Appellant states the conclusion he committed murder was contrary to the manifest weight of the evidence. He says the evidence did not credibly show he knew a robbery was going to be committed and death was a foreseeable result.

{¶103} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. It is not a question of mathematics but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion, whereas sufficiency involves the burden of production. *Id.* at 390 (Cook, J., concurring). The appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶104} This discretionary power of the appellate court is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution. The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389.

{¶105} In other words, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio

St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶106} Appellant argues the following testimony did not *credibly* prove he had knowledge a robbery would be committed: the former inmate's claim Thomas told him Appellant knew they were going to commit a robbery; the claim of the woman (who loved the victim {and Appellant} like a son) that Appellant acknowledged he knew he was accompanying his uncle on what he thought would be an "easy" robbery; and the portion of the detective's testimony claiming "bop" meant something other than what Appellant said he meant by it. The jury heard and saw the witnesses testify on direct and on cross-examination and could evaluate the explanations provided by these witnesses. It was the province of the jurors to notice behavioral pauses, verbal/non-verbal disconnects, demeanor, gestures, voice inflections, or eye movements and evaluate whether any of these indicators tended to project an aura of truthfulness or untruthfulness. The jury could reasonably believe the testimony Appellant contests here; it was believable.

{¶107} As aforementioned, in evaluating a weight of the evidence argument, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Lang*, 129 Ohio St.3d 512 at ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. Upon such review, we conclude this is not an exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice. We refuse to sit as the thirteenth juror in this case. This assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE:  MANDATORY BINDOVER

{¶108}  Appellant's fifth assignment of error provides:

"The mandatory transfer of Kalontae, an alleged juvenile offender, to the adult court system violated his rights to due process and equal protection, pursuant to *State v. Aalim* * * *."

{¶109}  In *Aalim*, the defendant was statutorily subject to mandatory transfer from the juvenile court to the general division.  He argued mandatory transfer violated his due process and equal protection rights as well as the prohibition against cruel and unusual punishment under the United States and Ohio Constitutions.  The appellate court rejected the defendant's challenge to the mandatory transfer statutes and affirmed the trial court's judgment.  In a 4-3 decision, the Ohio Supreme Court reversed the judgment of the appellate court and remanded to the juvenile court for an amenability hearing.  Specifically, the Court held the mandatory transfer of a juvenile to the general division violates a juvenile's right to due process under Article I, Section 16 of the Ohio Constitution.  *State v. Aalim*, __ Ohio St.3d __, 2016-Ohio-8278, __ N.E.3d __, paragraph one of the syllabus.

{¶110} The Court held an amenability hearing was necessary before any juvenile is transferred to the general division.  *Id.* at ¶ 20, 24-25.  Upon finding the mandatory transfer provisions in R.C. 2152.10(A) and 2152.12(A) unconstitutional, the Court severed those provisions.  *Id.* at ¶ 29.  "After the severance, transfers of juveniles previously subject to mandatory transfer may occur pursuant to R.C. 2152.10(B) and 2152.12(B) [the discretionary transfer provisions]."  *Id.*  The discretionary transfer process set forth in R.C. 2152.10(B) and 2152.12(B) through (E) was recognized as satisfying due process.  *Id.* at paragraph two of the syllabus.

{¶111}  The Court thereafter applied the *Aalim* holding to other cases without regard to the defendant's waiver of the issue in the trial court.  *See State v. D.B.*, __ Ohio St.3d __, 2016-Ohio-8334, __ N.E.3d __; *State v. Lee*, __ Ohio St.3d __, 2016-Ohio-8469, __ N.E.3d __.  However, on February 22, 2017, the Supreme Court stayed execution of its judgment in *Aalim* pending its decision on a timely reconsideration motion.  In accordance, this court held the present appeal in abeyance pending the *Aalim* reconsideration decision.

**{¶112}** On May 25, 2017, the Ohio Supreme Court issued its reconsideration decision in *Aalim*, affirming the appellate court's decision and concluding the mandatory transfer of juveniles under the statutory scheme was not unconstitutional. *State v. Aalim*, __ Ohio St.3d __, 2017-Ohio-2956, __ N.E.3d __. The Court held the mandatory transfer statutes were not violative of Ohio's Constitution because Article IV, Section 4(B) of the Ohio Constitution grants exclusive authority to the General Assembly to determine the subject matter to be allocated to the exclusive original jurisdiction of specified divisions of the courts of common pleas. *Id.* at ¶ 1-2.

**{¶113}** The Court concluded: "mandatory bindover of certain juveniles to adult court under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b) does not violate the Due Course of Law Clause or the Equal Protection Clause of the Ohio Constitution and the analogous provisions of the Fourteenth Amendment to the United States Constitution." *Id.* at ¶ 4. Appellant's brief asks this court to apply *Aalim*. As the *Aalim* decision relied upon by Appellant was vacated by the Supreme Court on reconsideration, this assignment of error is overruled.

**{¶114}** For the foregoing reasons, the trial court's judgment is affirmed.

Waite, J., concurs.

Donofrio, J.,concurs.