[Cite as *State v. Tataseo*, 2024-Ohio-2021.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

NATHAN TATASEO,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CO 0030**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2022 CR 00599

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito Abruzzino*, Columbiana County Prosecutor and *Atty. Alec A. Beech,*
Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Edward F. Borkowski Jr.*, for Defendant-Appellant.

Dated: May 24, 2024

**DICKEY, J.**

{¶1} Appellant, Nathan Tataseo, appeals his convictions following a jury trial in the Columbiana Court of Common Pleas for one count of aggravated murder in violation of R.C. 2903.01(A) (prior calculation and design), an unclassified felony and one count of murder in violation of R.C. 2903.02(A), an unclassified felony. Appellant was also convicted of one count of theft (bank card) in violation of R.C. 2913.02(A), a felony of the fifth degree, and one count of theft (personal property) in violation of R.C. 2913.02(A), a felony of the fifth degree.

{¶2} The victim, Appellant's 67-year old father, James Tataseo, sustained a fatal blow to his head from a portable space heater, which was delivered with such force that it crushed his skull and drove fragments of his skull into his brain. At the time, James was sitting in his recliner watching television.

{¶3} Appellant advances three assignments of error. First, he argues the trial court abused its discretion in admitting improper other-acts evidence. Second, Appellant contends the trial court erred in failing to provide a limiting instruction regarding the other-acts evidence. Significantly, no objection to the introduction of the other-acts evidence or the failure to provide a limiting instruction was raised before the trial court. Finally, Appellant argues his aggravated murder and murder convictions are against the manifest weight of the evidence. For the following reasons, Appellant's convictions are affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶4} The trial court accepted the testimony of sixteen witnesses offered by the state. No witnesses testified on behalf of Appellant.

{¶5} James, a retired systems analyst, and his wife Virginia Tataseo, raised three sons in their family home located at 230 South Elm Street in Columbiana County, Ohio. Jim, the eldest, is a registered nurse, and John, the middle son, is a director of software engineering. James was prideful of his sons' successes, and he enjoyed a particularly close relationship with his only biological grandson, J.T., John's son.

{¶6} Appellant, who is James' youngest son, was forty-six years old when he was accused of murdering his father. Appellant had lived in his parents' home his entire life, with one brief exception, and had never maintained steady employment. Although it

was Virginia who gave Appellant money, it was James who was Appellant's sole financial support for the majority of his adult life.

{¶7} Jim and John testified that Virginia was fiercely protective of her youngest son and consistently overrode any effort by a decidedly-frustrated James to compel Appellant to get a job by forcing him from his childhood home. Appellant's brothers were similarly frustrated with Appellant's failure to financially support himself, as well as resentful of Appellant's expectation that James should house, feed, and clothe him. Jim testified that Virginia struggled with mental illness, which caused a rift in their relationship, but strengthened his relationship with his father.

{¶8} An estrangement between Appellant and his brothers predated his criminal charges. Jim had not spoken to Appellant in the year preceding James' murder, but for a confrontation after Appellant was involved in a single-car accident with James' automobile.

{¶9} John traced the fracture in his relationship with Appellant to Appellant's failure to contribute money during a family outing. The Tataseo men and their friends spent every weekend during the spring and summer months fishing on the lake. On one such outing, John complained Appellant did not contribute to the expense of their weekly fishing excursions, and Appellant should "pay his fair share" if he wanted to continue. Appellant became "visibly * * * upset," (Trial Tr., p. 375), stopped speaking with John, and never participated in the weekend outings again.

{¶10} Appellant similarly withdrew from family functions. John testified that Appellant remained in his bedroom during John's family Christmas visit in the previous few years.

{¶11} Roughly five years before James' death, Virginia was hospitalized after suffering a series of transient ischemic attacks (mini strokes). When she was discharged from the hospital, Virginia resided at Covington Nursing Home in East Palestine, Ohio in order to participate in a rehabilitation program. In Virginia's absence, James ousted Appellant from the South Elm Street residence. However, Appellant's ouster was short-lived because when Virginia returned home, Appellant followed.

{¶12} In December of 2021, roughly six months before James' murder, Jim accompanied James to the parking lot of an elementary school on Shields Road in

Boardman, Ohio, at 11:30 p.m. where they discovered James' automobile with the front tire blown out and the airbag deployed. Appellant had been taken to the emergency room. Jim testified that James was very upset and found two lighters in the vehicle that "had a very strong aroma of marijuana." (*Id.*, p. 239.)

{¶13} Jim confronted Appellant at the house by throwing the lighters at him and "[basically telling] him it was time for him to grow up and get out and be a man and get out of the house." (*Id.*) Appellant had no reaction.

{¶14} Jim described Appellant's appearance as disheveled and unkempt. Jim believed Appellant was under the influence of marijuana.

{¶15} As a consequence, Appellant was forbidden to use James' vehicles. A photograph of the interior of James' garage was admitted into evidence. The photograph depicts a riding lawn mower parked behind his truck. Jim explained James had disabled the mower directly behind the truck in order to prohibit Appellant from removing the truck from the garage.

{¶16} In January of 2022, Virginia was hospitalized after suffering another minor stroke. However, as a result of cascading medical problems, including sepsis and a COVID-19 diagnosis, Virginia was placed on a ventilator. Ultimately, she required a feeding tube and was no longer able to ambulate. Following her hospitalization, Virginia returned to Covington Nursing Home as a permanent resident.

{¶17} In order to qualify Virginia for Medicaid, James engaged in a spend-down of their shared assets. Further, he had to pay the entire cost of the nursing home until Virginia met the eligibility requirements for Medicaid. When Virginia was approved for Medicaid, the majority of her subsequent monthly social security checks[1] was paid to the nursing home, leaving James with limited financial resources to sustain the house and his daily expenses.

{¶18} In addition to the monetary demand created by Appellant's financial dependency on his father, Appellant's behavior after Virginia left the family residence resulted in a strain on James' mental well-being. With Virginia no longer in the residence,

[1] The amount of Virginia's social security check was roughly one-half of the amount of James' social security check.

Appellant asked James for money, but James refused because he believed the money would be spent on illegal drugs. As a consequence, Appellant began stealing cash from James' wallet and power tools[2] from James' garage. When a firearm disappeared, James asked John to store James' remaining guns in John's garage. James installed a deadbolt on his bedroom door, in order to prevent Appellant from emptying his wallet and stealing his belongings.

**{¶19}** Following a physical altercation between James and Appellant, John encouraged James to report the assault and the prior series of thefts to the police department. However, James refused.

**{¶20}** James suffered from a number of physical ailments, including atrial fibrillation, obesity, diabetes, hypertension and a range of motion issues resulting from a knee replacement. He walked with a cane. Nevertheless, James visited Virginia at the nursing home every day, frequently twice a day. Virginia had a standing appointment at a wound care clinic located at Salem Hospital each Tuesday, which she refused to keep without James.

**{¶21}** John testified that he assisted James with his financial issues and Jim assisted James with health issues. In February of 2022, James uncharacteristically asked John for money. James confessed that he was behind with his bills and in arrears on his property taxes. John immediately paid James' overdue property taxes, as well as his property taxes for the upcoming year.

**{¶22}** John was surprised by James' financial problems, because James was collecting a monthly social security check and two small pensions at the time. Then John recalled a day in January when he drove James to the nursing home then stopped at the grocery store on the way home. John remembered James only bought enough groceries for one meal.

**{¶23}** In the months preceding James' murder, John frequently gave James money for food. James instructed John not to hand cash to James in Appellant's presence.

---

[2] Daniel Haueter, an East Palestine police officer, testified that drug dealers accept power tools in trade for drugs. He further testified that family members are common victims of theft by drug-abusing relatives.

**{¶24}** On Memorial Day of 2022, James informed John that he wanted Appellant out of the house. John called the local elder abuse hotline the same day with his father's approval. John reported Appellant's drug use, theft, and his physical altercation with James to Children and Adult Services ("CAS"). Because no imminent threat was believed to exist, no emergency court order was issued. Patricia Brown ("Brown") of CAS directed John to the Clerk of Court's website to print an "order of removal" form.

**{¶25}** Brown met with James at the local McDonald's on June 1, 2022. She testified James was pleasant, but concerned and frustrated with the situation. James cared about Appellant, but the issues between them had persisted for a long time. James reported that Appellant had stolen money, "wiped out all of [James'] belongings in his garage," and gone through half of James' savings. (*Id.*, p. 439.) Brown testified that Virginia had forbidden James from reporting Appellant's alleged criminal activity to the police.

**{¶26}** Raymond Crews ("Crews"), James' neighbor and friend for roughly thirty years, testified he and James spent a lot of time together after Virginia became a permanent resident at the nursing home, because James wanted to avoid Appellant. Crews testified that he and James were either sitting in his garage or on his porch, or were in James' garage fixing things.

**{¶27}** Over the years, Virginia and James frequently made excuses for Appellant regarding his lack of employment to Crews and his wife. Crews recalled a "great period of time" when Appellant complained that "his shoulder was popping out, and he would constantly have to go have his shoulder put in." Crews testified, "[a]nd that happened quite often. And, all of a sudden, the shoulder thing went away." (*Id.*, p. 454-455.)

**{¶28}** However, after Virginia moved from the family home permanently, James insisted that Appellant get a job and contribute to the household expenses. Following the thefts from James' garage, he purchased second-hand power tools and equipment from Crews, including an electric saw, shop vacuum and leaf blower. James asked Crews to store the tools in his garage until Appellant moved out of James' house.

**{¶29}** John assisted James in his effort to evict Appellant from 230 South Elm Street. During that process, John invited James to live with him until Appellant was out of the family residence. However, James refused to leave his home.

Case No. 23 CO 0030

{¶30}   James was required by Ohio law to give Appellant at least three-days notice to collect his belongings and find another residence prior to the eviction. James chose June 30, 2022.  John and James completed the requisite form and provided a copy to Appellant on June 2, 2022.  At the time, Appellant was asleep in his bed. He lowered the blanket covering his head, accepted the form, then pulled the blanket back over his head.

{¶31}   While John was on a family vacation in mid-June, James called to express his desire to expedite the eviction date.  On June 21, 2022, Appellant was served with an updated form and an eviction date of June 24, 2022.  Appellant walked down the steps to the first floor of the residence and accepted the paperwork without any reaction.  James had a telephone conversation with Brown that same day and informed her the eviction date had been expedited.

{¶32}   However, James extended the date to back to June 30, 2022 based on Appellant's representation that he was close to finding employment.  Appellant told James that he had applied for a job at a local envelope factory, however, inquiries following James' death revealed that no such application was ever filed.

{¶33}   On Saturday, June 25, 2022, James and John enjoyed a day of fishing. John told James that John had taken a vacation day on July 1, 2022 in order to accompany James to the courthouse if Appellant did not comply with the eviction notice on June 30, 2022.

{¶34}   That same evening, Detective Mark Edwards of the Columbiana City Police Department was dispatched to James' residence to investigate a disturbance.  James reported Appellant had been harassing James about money and the use of James' vehicles. James did not ask Detective Edwards to remove Appellant from the home, but simply to instruct Appellant to "leave [James] alone."  (*Id.*, p. 295.)  James denied any physical altercation had occurred.

{¶35}   Appellant had a key to the back door of the house. Both the front and back doors had door locks and deadbolts.  Appellant was not entrusted with the keys to the front door, the garage, or the keys to James' two vehicles.  It appears that Appellant's single key opened both the door lock and the deadbolt on the back door, as James planned to switch the deadbolts on the front and back door to prohibit Appellant from reentering the home after June 30, 2022.

**{¶36}** In the week leading to James' murder, he was informed by his bank that someone attempted to cash a check he had written to the nursing home, and the check had been altered to ten times the original amount. As directed by the bank, James closed his old checking account and opened a new account to avoid any additional fraud.

**{¶37}** James reported the check fraud to the Columbiana City Police Department on June 22, 2022. He returned to the police station on June 28, 2022 to add that the nursing home had informed him of three other instances of check fraud (presumably involving other residents.) The officer who took James' report testified that the additional information was "[r]eally irrelevant to [James'] case."

**{¶38}** On Monday, June 27, 2022, Brown received a voice mail message from James. He informed her that he planned to come to the courthouse on Friday, July 1, 2022 in order to file the eviction papers. James visited Crews that evening and likewise expressed his plans to evict Appellant on June 30, 2022. Crews described James as tired and not walking very well that evening. Crews' last words to James were "[p]lease be careful and watch your back." (*Id.*, p. 464.)

**{¶39}** On the evening of June 28, 2022, Jim stopped to visit James and brought a pizza. James informed Jim that the eviction was still proceeding, but Appellant had indicated he was in contention for a job at the local envelope factory. Jim observed James would likely have permitted Appellant to remain at the house if he was employed.

**{¶40}** That evening, Jim invited James to stay with Jim's family until the eviction was complete. James "steadfastly" refused to leave his own home. (*Id.,* p. 257.) Concerned for James' safety, Jim offered to give James a handgun, but James refused to arm himself.

**{¶41}** James planned to sell the family home in order to downsize and save money. Jim and John encouraged James to consider moving into a senior living apartment complex located near John's place of business and J.T.'s school. Although James was skeptical at first, by June 28, 2022, he was "a little excited" about the prospective move, particularly the opportunity to spend time with J.T. after school. (*Id.*, 255.)

{¶42} Appellant walked around his neighborhood almost every morning. He explained that he was getting older and suffering some leg pain and stiffness, and he believed his morning constitutional improved the strength and flexibility in his legs.

{¶43} On Thursday, June 30, 2022, between 8:45 and 9:00 a.m., Appellant was walking through the parking lot of the Col-Pump Co. ("Col-Pump"), a local foundry located at 131 E. Railroad Street, roughly two blocks south of the Tataseo residence. Corey Bowker ("Bowker"), the manager at Col-Pump, mistook Appellant for a Col-Pump employee because Appellant was wearing his black hoodie over his head. Bowker shouted, "Not break yet. Where you [sic] going?" (*Id.*, p. 471.)

{¶44} When Appellant explained that he was not an employee, Bowker asked Appellant if he was looking for work. Appellant responded, "yes," and Bowker encouraged him to apply for a job at Col-Pump. Appellant explained that he wanted to take a shower but he would return shortly.

{¶45} Appellant had worked at Col-Pump after he graduated from high school. Appellant told investigators that he had applied for jobs "all over town," but had not completed an application at Col-Pump because he did not think he would be rehired. Appellant returned to Col-Pump that same day. He completed an application and interviewed for a job. He was hired and he began working the following morning.

{¶46} Around 6:30 p.m. on June 30, 2022, the day that Appellant was hired at Col-Pump, John texted Jim and asked him to stop at James' house. John had been attempting to reach James by telephone throughout the day to no avail, in order to determine if Appellant had complied with the eviction notice. The battery in James' old mobile telephone, which he reliably carried in his shirt pocket, required frequent recharging. John and Jim presumed that James was at the nursing home and his mobile phone was either turned off or simply out of battery.

{¶47} Jim called the nursing home early that Thursday evening as he drove to James' house. Jim was alarmed when he learned James' last visit with Virginia was on Tuesday, June 28, 2022, when he accompanied her to the wound care clinic at Salem Hospital.

**{¶48}** When Jim arrived at 230 South Elm Street, he pulled his vehicle to the back of the house, near the garage. Jim unlocked the garage door and confirmed that both of James' vehicles were there.

**{¶49}** As Jim entered the house, he noticed that both the lock on the back door and the deadbolt were set. Jim testified that James typically locked only the deadbolt on the back door.

**{¶50}** When Jim entered the living room, he found James' lifeless body in his recliner. Jim confirmed that James was dead, describing his body as "ice cold." (*Id.*, p. 277.) Jim exited the home through the front door and contacted the county police department. Jim noted that both the lock on the front door and the deadbolt were set. Next, Jim called John to share the heartbreaking news, and John immediately travelled to the crime scene.

**{¶51}** The county's major crimes task force and the Ohio Bureau of Criminal Investigations ("BCI") were dispatched to investigate the scene. In order to clear the house, investigators kicked in James' bedroom door, which was dead-bolted. Inside James' bedroom, investigators found James' wallet, which contained his identification but no money. Inside Appellant's bedroom, investigators found a collection of knives, including a hunting knife, a buck knife, and several folding knives, as well a spiral-bound notebook.

**{¶52}** Detective Edwards, who had been dispatched to the scene for the second time that week, testified that James' head was covered in dried blood. To the left of the recliner, there was a "stand table," with mail and three newspapers. A portable space heater sat on the floor next to the recliner. The space heater was unplugged.

**{¶53}** There was blood spatter on the stand table and the floor surrounding the recliner. The blood spatter was consistent with the victim being struck from behind while in a reclined position.

**{¶54}** The three newspapers on the stand table were dated June 28, 29, and 30, 2022. The newspaper dated June 28, 2022 was opened to the sports page, and was the only paper that contained blood spatter. The mail and the other two newspapers, which were dated June 29 and 30, 2022 and still in the plastic sleeve, were on top of the blood-covered June 28, 2022 sports page, but contained no blood spatter. Appellant conceded

during a police interview that James read the paper every day as a part of his daily routine, typically in the morning but on rare occasion in the evening.

{¶55} The portable space heater on the floor also contained some blood spatter, but a portion of the device appeared to have been wiped clean. A criminologist from BCI testified there were no fingerprints of sufficient quality for comparison on the space heater or the plastic newspaper sleeves.

{¶56} Investigators found a television remote nestled between James' legs. However, James' large flat-screen television was missing. There was a void in the dust on the cabinet where the television had previously sat. In the kitchen, there was food and water in the dog's bowls.

{¶57} James kept a large 2022 calendar in the dining room. For the month of June, each day was marked with an "X," with the exception of June 28th, 29th and 30th (Tuesday through the current day (Thursday)). The pills for Monday and Tuesday were the only pills missing from James' weekly pill organizer, which investigators found in the dining room hutch.

{¶58} James' autopsy was performed by the Cuyahoga County Medical Examiner's Office. The medical examiner testified that the result of James' autopsy, performed on July 1, 2022, was consistent with the conclusion that James died three days earlier, and that a precise time of death could not be determined.

{¶59} After the dried blood on James' head was removed, the medical examiner discovered three distinct evenly-spaced linear wounds, which directly corresponded to the fins on the space heater. Blood swabs on the heater produced a single-source DNA profile consistent with James.

{¶60} On the dining room table, investigators found James' laptop computer, which had financial paperwork and the eviction paperwork folded inside. No keys were found at the residence.

{¶61} Jim and John remained at the crime scene until roughly 1:30 a.m. on July 1, 2022. When they were permitted to enter the residence, Jim searched in vain for James' car and house keys, his mobile telephone, and his debit card. Appellant did not return to the residence that evening.

{¶62} Friday, July 1, 2022, marked Appellant's first day at Col-Pump. Bowker drove past the crime scene on his way to work and during a discussion of the grisly discovery at the Tataseo home that morning, one of the secretaries noticed the victim and the company's newest hire shared the same last name. As a consequence, Bowker visited the crime scene to report Appellant's location. Investigators informed Bowker that they would visit Col-Pump later that morning to interview Appellant.

{¶63} Patrick Wright ("Wright"), a criminal investigator employed by the prosecutor's office interviewed Appellant later that day. Appellant was wearing jeans, a sleeveless grey shirt, and an orange baseball cap. His clothes were dirty and his face unshaven. When Appellant was first seated, Appellant sighed and made no eye contact. He did not ask why he was being interviewed.

{¶64} When the interview began, Wright's counterpart informed Appellant that his father was dead. Appellant responded, "What? How?" Wright replied, "that's kind of why we're here. There was an obvious incident that happened at his residence on Elm Street, and it's our understanding that you lived with Pops for a while." Although Wright's counterpart was in the middle of his statement, Appellant immediately interjected that he had moved from the South Elm residence on Monday, June 27, 2022.

{¶65} When asked about the family situation, Appellant explained his mother was in a nursing home and his father had plans to sell the family home in order to pay her medical bills then move to Pennsylvania. Based on the foregoing circumstances, James informed Appellant that he had to vacate the family residence by June 28, 2022.

{¶66} Appellant described his relationship with James as "mediocre." He characterized James as frequently grumpy due to his age and infirmities. In addition to his physical problems, James was "all wrapped up" about Virginia's inability to return home. Appellant told investigators that he did not want to be an additional burden, so he moved from his father's house on June 27, 2022, a day earlier than planned.

{¶67} However, later in the interview, Appellant stated James refused to allow Appellant to use James' vehicles, and that is when Appellant knew he "had to go." Appellant told investigators that he asked his father to use the car on the previous Saturday (June 25, 2022), but James refused. James said Appellant was acting "unruly" that evening, so James called the police.

{¶68} Roughly forty minutes into the interview, Appellant conceded James had accused him of stealing power tools from the garage and engaging in check fraud. However, Appellant stated he could not have stolen anything from the garage because he did not have the garage key. He further stated James had apologized about the check fraud accusation when James learned Appellant was not involved.

{¶69} According to Appellant, the last time he saw his father was approximately 11:00 a.m. on June 27, 2022, just before James departed for the nursing home. According to Appellant, James offered to give him money for an apartment, but only after Appellant found one. Before James left, he asked Appellant if he had found a job yet, and Appellant responded, "no." Appellant explained to investigators that he had acquired a job at a local envelope factory, but lost the job before his first day.

{¶70} Appellant did not have a mobile telephone, but admitted he last used James' mobile telephone a couple of weeks earlier. Appellant claimed his use of James' mobile telephone was another bone of contention because James' mobile telephone had prepaid minutes. Appellant denied using James' telephone on June 27th, 28th, 29th, and 30th.

{¶71} Appellant told investigators he left the family residence with a couple of cans of beans and the "clothes on his back," and had spent the last few nights sleeping in the woods against a fallen tree to "huddle up against" in the event of rain. He explained that James offered to take him to a homeless shelter, but that Appellant expressed he preferred to be homeless and work. When asked where he planned to shower before his Col-Pump interview, Appellant stated he had planned to bathe in the creek, but ultimately changed his mind.

{¶72} Appellant informed Wright that he spent the previous day lying around in the woods, but for his morning constitutional, during which he stopped for a cup of coffee at a local convenience store. Appellant warranted he never returned to James' residence after he left on June 27, 2022.

{¶73} However, Valerie Kerchofer ("Kerchofer"), the Tataseo's next-door neighbor in the summer of 2022, was interviewed prior to Appellant's Col-Pump interview. She told investigators that she saw Appellant leave James' house between 7:30 and 7:45 a.m. then walk down the street almost every day. Appellant regularly wore jeans and a black hoodie, and he had lost a noticeable amount of weight in the previous few months.

{¶74} Kerchofer specifically recalled seeing Appellant walking from James' front porch on June 30, 2022. On June 29, 2022, Kerchofer was sitting in her automobile at the end of her driveway when she saw Appellant "close the front door, walk down off the porch, and start walking north on South Elm." (*Id.*, p. 490.) During her trial testimony, she confirmed she saw Appellant "exit his house." On June 28, 2022, Kerchofer opened her front door expecting to find a package on her porch, but instead saw Appellant walking north on South Elm Street.

{¶75} Confronted with the information provided by Kerchofer during his interview at Col-Pump, Appellant suddenly recalled he had walked up on the front porch at James' house around 10:00 a.m. the previous day, to ask his father for food and tell him that he was living in "crappy conditions." (*Id.*, p. 517.) James did not answer the door.

{¶76} Appellant described the clothing he was wearing the previous day and specifically denied wearing or even owning a black hoodie. When Appellant was asked if he had taken any other clothes out to the woods, he responded he had only the clothes he was wearing as he did not want to carry any additional clothes.

{¶77} When Wright asked if Appellant entered the house the previous day, Appellant repeated roughly twenty times that he could not have entered the house because he did not have the house keys. Appellant told Wright that he left his only key by James' computer on June 27, 2022 per James' request.

{¶78} Appellant repeatedly denied having any problems with his father. However, based on the fact that there was no forced entry into the house, investigators explained to Appellant that he was a person of interest. Appellant denied killing his father.

{¶79} Appellant claimed he had stopped consuming alcohol many years earlier because Virginia did not want him to have a drinking problem like his father and his brothers. However, Appellant conceded to some marijuana use to alleviate back pain caused by a compressed disc.

{¶80} At the conclusion of the interview, investigators seized Appellant's clothing, including a black hoodie, which was found at Appellant's work station. They also seized a neck gaiter, that is, a gathered scarf typically worn as a face covering during the COVID-19 pandemic, and a glass smoking device commonly used to smoke marijuana.

{¶81} Investigators searched the woods for Appellant's camp site, based on his description of a fallen tree, but discovered instead a three-sided hunting blind in the woods.  In the hunting blind, investigators found a makeshift bed constructed from cushions from an abandoned couch.  They also found food, a flashlight, a pot, a hunting knife, a laundry bag filled with clothes and an army duffle bag. The army duffle bag contained several sets of James' house and vehicle keys.

{¶82} Among Appellant's clothing, investigators found a green t-shirt that contained blood. DNA analysis determined there was a mixture of blood on the green t-shirt.  Appellant was the major contributor, but the sample of the minor contributor was insufficient for identification.  Surveillance video from around the neighborhood established Appellant was wearing the green t-shirt on the day that James was murdered.

{¶83}  When Appellant returned to the hunting blind, he was surprised to discover investigators at the site. They instructed him that he could not remain at the scene while they executed a search warrant.

{¶84}  Later that day, Appellant was found in a nearby culvert pipe.  He was arrested for falsification, based on his statements denying possession of James' house keys.

{¶85}  During an interview conducted after the search, Appellant asserted he tried to check on James the previous day.  At first, Appellant claimed his father did not even know that he had moved out.  However, when Appellant was confronted with the multiple sets of keys found in the army duffle bag, he stated James packed the army bag for Appellant on Sunday, June 26, 2022, and James must have put the keys in the duffle bag.  Appellant explained that James hid things, like his keys and his wallet.

{¶86}  When asked why he lied about sleeping near a fallen tree, rather than the hunting blind and having only the "clothes on his back," Appellant said he did not want investigators to find the hunting blind because he needed his clothes for work and he did not want them to be seized.  When asked if he murdered his father, Appellant responded he was afraid of his father and he had never even "spoke back to him." Appellant described himself as his parents' caretaker.

{¶87}  Investigators requested an emergency ping from Verizon in the early morning hours of July 1, 2022.  Mobile telephone companies provide subscribers' location

data to law enforcement in exigent circumstances. Although James' telephone was never located, the emergency ping from James' mobile telephone registered in the early morning hours of July 1, 2022 was close in proximity to the hunting blind.

**{¶88}** James' mobile telephone records revealed a flurry of 32 telephone calls that took place between 10:00 p.m. and 11:55 p.m. on Tuesday, June 28, 2022. When the telephone numbers were traced, at least six of the recipients were convicted drug dealers and violent criminals located in Youngstown, Ohio. Many of the same recipients had been called roughly two weeks prior to June 28, 2022, during the time Appellant conceded he had used James' mobile telephone, and shortly before the power tools were stolen from James' garage. The spiral-bound notebook found in Appellant's room at 230 South Elm contained a list of telephone numbers, which included several of the telephone numbers called on Tuesday, June 28, 2022 and two weeks prior.

**{¶89}** Surveillance video at PNC Bank in Columbiana captured Appellant attempting to withdraw money from the ATM machine on June 29, 2022. A man wearing a black hoodie, an orange baseball cap, and a gaiter, attempts to withdraw money with James' ATM card at 7:19 a.m. and 8:42 a.m. The man has the hoodie over his head in an apparent effort to conceal his identity.

**{¶90}** The first request was declined for insufficient funds. The second request was approved for $63.75 ($60 plus a $3.75 fee). The third request for $240, the fourth request for $100, the fifth request for $60, and the sixth request for $40 were all declined. A balance inquiry revealed a zero balance.

**{¶91}** Appellant was convicted on all counts in the indictment. At the sentencing hearing, the trial court merged Appellant's conviction for murder with his conviction for aggravated murder and imposed a sentence of life imprisonment, in addition to twelve-month sentences for each theft conviction. The sentences were imposed to be served consecutively. This timely appeal followed.

**{¶92}** The first and second assignments of error are related and addressed together for the purposes of clarity and judicial economy.

**ASSIGNMENT OF ERROR 1**

**THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO INTRODUCE INADMISSIBLE OTHER-ACTS EVIDENCE.**

**ASSIGNMENT OF ERROR 2**

**THE TRIAL COURT ERRED BY FAILING TO PROVIDE A LIMITING INSTRUCTION.**

**{¶93}** On May 4, 2023, the State filed a pleading captioned, "404(B) Notice," which reads in pertinent part:

Now comes the State of Ohio * * * and states its intention to introduce material that could potentially be deemed 404(B) material at the upcoming trial. The State intends to utilize information contained in the following reports previously disclosed to defendant through discovery: Columbiana Police Report from 6/16/22 (number 22-06535); Columbiana Police CAD Report from 6/25/22 (number 22-06903); and Adult Protective Services Report (number 4185900-1). Testimony concerning the defendant's actions/conduct are admissible under Rule 404(B) as they prove motive, opportunity, intent, knowledge, identity, and the absence of mistake or accident.

**{¶94}** The state did not identify the specific exception or exceptions that applied to remove the various reports from the application of the evidentiary rule. Further, no objection was raised at trial regarding the introduction and admission of the evidence. As a consequence, the trial court did not provide a limiting instruction when the evidence was introduced, or during the general jury instruction provided to the jury prior to their deliberations.

**{¶95}** Evid.R. 404(B) "categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123. Although a trial court is precluded as a matter of law from admitting improper character

evidence under Evid.R. 404(B), the trial court has discretion to admit other acts evidence that has a permissible purpose. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 72, 172 N.E.3d 841, citing *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22 ("the admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law"), citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 17 (the rule bars evidence to prove character in order to demonstrate conforming conduct, but it gives the trial court discretion to admit other acts evidence for a permissible other purpose).

**{¶96}** Evid.R. 404(B) provides in its entirety:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶97}** Further, R.C. 2945.59 reads in its entirety:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

In other words, "while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Hartman*, *supra*, at ¶ 22.

Case No. 23 CO 0030

**{¶98}** There are three requirements to admit other-acts evidence:

(1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice, Evid.R. 403.

*Graham*, *supra*, at ¶ 72.

**{¶99}** In general, evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination * * * more probable or less probable than it would be without the evidence." Evid.R. 401. *See also* Evid.R. 402 ("Evidence which is not relevant is not admissible."). In the context of Evid.R. 404(B), the relevancy determination is predicated upon "whether the evidence is relevant to the particular purpose for which it is offered" which must be a proper purpose other than to show character or propensity. *Hartman*, *supra*, at ¶ 26.

**{¶100}** Evid.R. 404(B) contains a "nonexhaustive list of the permissible nonpropensity purposes for which other-acts evidence may be introduced." *Id.* "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27. Evidence of similar acts "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.* at ¶ 28.

**{¶101}** If the evidence is not presented to show character and is relevant to a permissible purpose in Evid.R. 404(B), then the trial court employs its discretion to determine whether the probative value "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Id.* at ¶ 29-30, citing Evid.R. 403(A). "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis." *Id.* at ¶ 30. The trial court must consider the degree to which the fact is truly in dispute or can be shown with alternative evidence. *Id.* at ¶ 31-32.

Case No. 23 CO 0030

**{¶102}** In *Smith*, *supra*, the Ohio Supreme Court opined:

[T]he problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant. *Hartman* at ¶ 25; *see* 1A Wigmore, *Evidence*, Section 58.2, at 1212 (Tillers Rev.1983). In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute. *Hartman* at ¶ 26-27; *see also Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

Thus, courts should begin by evaluating whether the evidence is relevant to a non-character-based issue that is material to the case. If the evidence is not premised on improper character inferences and is probative of an issue in the case, the court must then consider whether the evidence's value "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A); *Hartman* at ¶ 29. Because other-acts evidence " 'almost always carries some risk that the jury will draw the forbidden propensity inference,' " courts should be vigilant in balancing the prejudicial impact of the evidence against its probative value. *Id.* at ¶ 33, quoting *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir.2014) (en banc).

*Smith*, *supra*, at ¶ 37-38.

**{¶103}** Finally, when other-acts evidence is admitted for a limited purpose, "the jury should be instructed that such evidence must not be considered by them as any proof whatsoever that the accused did any act alleged in the indictment." *State v. Flonnory*, 31 Ohio St.2d 124, 129, 285 N.E.2d 726 (1972). Here, Appellant did not object to the introduction of the other-acts evidence or the trial court's failure to provide a limiting instruction before the trial court. Where the defense fails to request a limiting instruction on other-acts evidence, the trial court's failure to give such an instruction is not plain error where it cannot be determined the jury used other-acts evidence to convict the defendant because he was a bad person. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920

N.E.2d 104, 136; citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, 91, citing *State v. Grant*, 67 Ohio St.3d 465, 472, 620 N.E.2d 50 (1993).

{¶104} A three-part test is used to determine whether plain error exists. *City of Campbell v. Rosario*, 2018-Ohio-337, 101 N.E.3d 681, ¶ 12 (7th Dist.), citing *State v. Billman*, 7th Dist. Monroe Nos. 12 MO 3, 12 MO 5, 2013-Ohio-5774, ¶ 25 (citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002)). The first prong requires the existence of an error, i.e. "a deviation from a legal rule." *Billman*, at ¶ 25. Second, the error must be plain, i.e., it must be an "obvious" defect in the trial proceedings. *Id.* The third prong requires that the error must have affected "substantial rights." *Id.* In other words, the trial court's error affected the outcome of the trial. *Id.* Plain error is a discretionary doctrine the appellate court may choose to use only with the utmost care in exceptional circumstances when required to avoid a manifest miscarriage of justice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62.

{¶105} In Appellant's first assignment of error, Appellant argues, "[t]here were many, many instances in which the state elicited testimony about other things Appellant purportedly did. One of the prevailing themes of the trial was that Appellant was a bad guy who was more likely to have killed his father because he had done bad things in the past." (Appellant's Brf., p. 10.) Appellant provided the following list of the purported improper other-acts evidence:

(1) Appellant's alleged theft of the victim's car in December of 2021;

(2) Appellant's alleged theft of the victim's money;

(3) Appellant's alleged physical altercation with the victim;

(4) Jim's concern for the victim, based on the escalation of Appellant's physical altercations with the victim;

(5) Officer Edwards' testimony that he was dispatched to the victim's home for a "general disturbance" report, and the victim reported Appellant was harassing him about money and his vehicles, and the victim wanted

Officer Edwards to instruct Appellant to "leave [the victim] alone" (Columbiana Police CAD Report from 6/25/22 (number 22-06903));

(6) John's testimony that he believed Appellant was abusing drugs based on Appellant's appearance and his behavior:

(7) John's testimony that Appellant would get upset if he did not get his way;

(8) John's accusations to the elder abuse hotline on Memorial Day that Appellant was a known drug abuser, who was stealing from the victim's house, and had engaged in a physical altercation with the victim (Adult Protective Services Report (number 4185900-1)); and

(9) Brown's testimony that the victim told her Appellant had stolen from him and emptied his savings account (Adult Protective Services Report (number 4185900-1)).

{¶106} The state argues the challenged evidence does not constitute other-acts evidence. Because Appellant's alleged commission of assault[3] and theft[4] were never proven, the state argues they are mere accusations, which are not subject to the other-acts prohibition.

{¶107} However, the accusations of assault and theft could be misinterpreted by the jury in the same manner as other-acts evidence, that is, the jury could conclude the allegations of assault and theft establish Appellant's bad character based on his propensity to commit crimes. Therefore, we find the accusations constitute other-acts evidence, but fall within the exception to the rule for motive.

{¶108} The state argued James' murder was the result of his "decaying relationship" with Appellant, which culminated in the eviction process. Regardless of whether Appellant actually committed the alleged assault and thefts, the evidence that

---

[3] The alleged assault was marginalized by other testimony. James denied any physical confrontation at his meeting with Brown on June 1, 2022 and when Edwards was dispatched to the residence on June 25, 2022.

[4] It is important to note that Appellant's theft of personal property conviction did not relate to the power tools in the garage.

James reported the crimes to law enforcement and believed Appellant was the perpetrator is relevant evidence of motive.

{¶109} Moreover, the other-acts evidence related to a fact in dispute, that is, Appellant's willingness to voluntarily leave the home. During his July 1, 2022 interviews with investigators, Appellant characterized himself as his parents' caretaker and warranted that he voluntarily left the family residence in order to alleviate James' stress. Appellant's story is completely inconsistent with the other-acts evidence, which demonstrates Appellant's behavior in his mother's absence had become so egregious that James was forced to evict him from the family home. Appellant further warranted James offered to give him money for rent, which is wholly at odds with testimony that James was struggling financially due to Appellant's theft of James' money and personal property.

{¶110} Finally, we find the other-acts evidence was more probative than prejudicial. The other-acts evidence was essential to demonstrate Appellant had resorted to theft when Virginia's absence left him penniless, and that eviction was a last recourse for a cash-strapped James, who asked his neighbor to hide second-hand tools from Appellant for fear they would be stolen.

{¶111} In summary, we find the other-acts evidence challenged by Appellant was offered to establish Appellant's motive for murder, not because it demonstrated propensity or bad character. The evidence established Appellant had no intent to voluntarily leave the family home, as he preferred to steal from his father rather than get a job. Accordingly, we find the admission of other-acts evidence did not constitute a violation Appellant's substantial rights.

{¶112} Turning to the second assignment of error, a limiting instruction would have clarified the purpose for which the allegations of assault and theft were being introduced, and prohibited the jury from considering the accusations as evidence of propensity and bad character. However, even in the absence of a limiting instruction, we find Appellant failed to demonstrate that the jury convicted him solely because he is a bad person. The record contains considerable evidence of Appellant's guilt independent of the accusations of assault and theft. The presence of the newspapers (dated after James' death) on the stand table, as well as the water and food in the dog's bowls, establish the

perpetrator returned to the residence after James' death. James' mobile telephone records reveal over thirty telephone calls were placed after James' death, several of which were to the same contacts that Appellant conceded he had called two weeks earlier. Moreover, several of the recipients' telephone numbers were listed among the contacts in the spiral-bound notebook found in Appellant's bedroom. Appellant had possession of James' ATM card and used it to withdraw money after James' death. Finally, the evidence revealed several false statements Appellant told investigators, including that he did not own a black hoodie, he took only the clothing "on his back" when he left the residence, he could not have killed James because Appellant did not have the house keys, and he was living next to a fallen tree in the woods from June 27, 2022 to July 1, 2022. In other words, there was compelling evidence independent of the other-acts evidence upon which the jury could have relied to conclude that Appellant murdered his father.

{¶113} In summary, we find the challenged evidence constitutes other-acts evidence with a nonpropensity purpose, that is, Appellant's motive to murder his father. The evidence was relevant, it was offered to establish a fact in dispute, and its introduction at trial was more probative than prejudicial, particularly considering the other evidence in the record. Further, even in the absence of a limiting instruction, we conclude the jury did not convict Appellant simply for being a bad person. Insofar as Appellant failed to demonstrate the introduction of the challenged evidence and the failure to provide a limiting instruction resulted in a violation of his substantial rights, we find the first and second assignments of error have no merit.

### ASSIGNMENT OF ERROR 3

**APPELLANT'S CONVICTIONS WERE AGAINST THE MANFIEST WEIGHT OF THE EVIDENCE.**

{¶114} Weight of the evidence concerns the effect of the evidence in inducing belief and appellate review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court

reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. Where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution.

**{¶115}** The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and to judge the witnesses' credibility by observing their gestures, voice inflections and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "[Appellate courts] therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, [the appellate court does] not choose which one [ ] is more credible." *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist. 1999).

**{¶116}** In his third assignment of error, Appellant argues the record contains no evidence of violent behavior on his part, other than his brothers' "vague assertion" of a physical altercation with James. (Appellant's Brf., p. 16.) For instance, on the two occasions when Appellant was presented with the eviction notice, he reacted without emotion. Appellant further argues there is no forensic evidence connecting Appellant to the crime, as the DNA on the space heater belonged to James and the identifiable DNA on the green t-shirt belonged to Appellant. Finally, Appellant argues he had ready access

Case No. 23 CO 0030

to a collection of knives, so his alleged use of the space heater "did not make sense." (*Id.* at 17.)

{¶117} To the contrary, we find the greater amount of credible evidence supports Appellants' convictions for aggravated murder and murder. Insofar as there was no evidence of forced entry, Appellant and Jim were the only individuals with access to the victim. Moreover, based on James' time of death, the perpetrator returned to the South Elm residence to collect the mail and newspapers and placed them on the table stand next to James' body, as well as filled the dog's food and water bowls.

{¶118} It is undisputed that Appellant's lifelong enabler was gone from the household in June of 2022, and he was being evicted from his home of forty-six years. Appellant characterized his departure from the home as a voluntary and charitable act, undertaken to alleviate a burden from his father. However, there was a documented history of animosity between Appellant and his father, predicated in large measure on Appellant's failure to contribute to the household expenses and his theft of his father's money and property. Moreover, in 2022, James for the first time had reported Appellant's alleged criminal activity to law enforcement, as well as sought the intervention of law enforcement in their father/son disputes.

{¶119} A search warrant of Appellant's makeshift campsite yielded James' house and vehicle keys. During his police interview at Col-Pump, Appellant repeatedly and emphatically cited his lack of access to the home as irrefutable evidence that he did not murder his father.

{¶120} When confronted with his possession of the keys, Appellant's speculation that James must have hidden the keys in the army duffle bag when he packed the bag for Appellant on Sunday, June 26, 2022, is incredulous. The purported explanation directly contravenes Appellant's own admission that James did not permit Appellant to use James' vehicles. In fact, Appellant stated during the Col-Pump interview that James' intractability regarding Appellant's use of the vehicles on Saturday, June 25, 2022, was the catalyst for his departure from the house two days later.

{¶121} Surveillance video captured Appellant withdrawing money from James' bank account after James' death. Defense counsel offered no explanation for Appellant's possession of James' bank card.

{¶122} Mobile telephone records established over thirty telephone calls were made following James' death. Several of the outgoing numbers belonged to convicted violent criminals and drug dealers, which were found in Appellant's spiral-bound notebook.

{¶123} Finally, Appellant was caught in a series of falsehoods, including: (1) Appellant warranted that he took only the "clothes on his back" when he permanently vacated the family home on June 27, 2022; (2) he claimed that he did not return to the house on June 30, 2022; (3) Appellant fabricated stories about his whereabouts between June 27, 2022 and June 30, 2022; (4) he told interviewers he was sleeping near a fallen tree, rather than the hunting blind; and (5) Appellant stated he did not own a black hoodie and repeatedly denied possessing any house keys, both of which were found in his possession.

{¶124} For the foregoing reasons, we find the trier of fact did not clearly lose its way nor create such a manifest miscarriage of justice that Appellant's murder convictions must be reversed and a new trial ordered. Accordingly, we find Appellant's third assignment of error has no merit.

## CONCLUSION

{¶125} Based on a review of the record, Appellant's aggravated murder and murder convictions are affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 23 CO 0030

[Cite as *State v. Tataseo*, 2024-Ohio-2021.]

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**